405 F.2d 215
 David H. SCHOENBAUM, Plaintiff-Appellant,
v.
Bradshaw D. FIRSTBROOK, et al., Defendants, and
Harold W. Manley, Louis Pradal, John C. Rudolph, Donald K. Russell, Aquitaine Company of Canada, Ltd., and Paribas Corporation of New York, Defendants-Appellees.
 No. 160.
 Docket 31408.
 United States Court of Appeals Second Circuit.
 Argued November 8, 1967.
 Decided by a Three-Judge Panel May 29, 1968.
 Submitted to the En Banc Court July 31, 1968.
 Decided December 30, 1968.
 
 COPYRIGHT MATERIAL OMITTED Sidney B. Silverman, New York City, for appellant.
 Whitney North Seymour, Jr., New York City (Simpson, Thacher & Bartlett, and John C. Diller, New York City, on the brief), for appellees Manley, Rudolph and Russell.
 Michael M. Maney, New York City (Sullivan & Cromwell, and Marvin Schwartz, New York City, on the brief), for appellees Aquitaine Co. of Canada, Ltd., and Pradal.
 David Hartfield, Jr., New York City (White & Case, Thomas A. Butler and Paul J. Bschorr, New York City, on the brief), for appellee Paribas Corp.
 Before: LUMBARD, Chief Judge, MEDINA, Senior Circuit Judge,* WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 After a panel opinion in this case was issued a petition for rehearing en banc was granted. Additional briefs were submitted including an amicus brief by the Securities and Exchange Commission. On consideration by the full court the order of the district court granting summary judgment for the defendants is affirmed as to the defendant Paribas Corporation and reversed as to the other defendants.
 
 
 2
 The petition for rehearing sought reconsideration only of the issue of whether the defendants were entitled to summary judgment under Rules 12(c) and 56 of the Federal Rules of Civil Procedure. The court en banc has not reviewed the decision announced by Chief Judge Lumbard on the issue of jurisdiction over the subject matter and that decision stands as the holding of the court.
 
 
 Factual Background of the Controversy
 
 
 3
 This is a stockholder's derivative action on behalf of Banff Oil Ltd., a Canadian corporation. The corporate defendants are Aquitaine Company of Canada, Ltd., and Paribas Corporation. The individual defendants are directors of Banff. Aquitaine is a wholly owned subsidiary of a French corporation, Société National des Petroles d'Aquitaine, which is in turn a subsidiary of an agency of the French government. Paribas is an investment banking corporation, incorporated in Delaware. It is a wholly owned subsidiary of a French banking institution.
 
 
 4
 In February, 1964, Aquitaine acquired control of Banff through a tender offer to Banff shareholders. Aquitaine thereupon designated three of its representatives to sit on Banff's eight man board of directors.
 
 
 5
 In March, 1964, Banff and Aquitaine agreed to conduct joint explorations for oil. The exploratory operations involved in the present case began toward the end of 1964. A test well struck oil on February 6, 1965 and on March 17, 1965 the well was completed.
 
 
 6
 On December 11, 1964, Banff's board of directors voted to offer 500,000 shares of Banff treasury stock to Aquitaine, its controlling shareholder, at $1.35 a share. The closing price of Banff stock on the Toronto Stock Exchange on that day was $1.31 bid and $1.37 asked. Aquitaine claims that the sale of stock was necessary in order to finance Banff's share of the expenses of exploration However it appears that Banff needed only $77,500 for this purpose, whereas the proceeds of the sale amounted to $675,000. On January 5, 1965, the president of Aquitaine wrote to Banff "on behalf of Aquitaine's members of Banff Oil Board" saying "our Chairman and Managing Director * * * has agreed to your * * * proposal." The shares were delivered to Aquitaine on March 16, 1965, the day before the completion of the first well.
 
 
 7
 In November 1965 Paribas negotiated a purchase of 270,000 shares of Banff stock at $7.30 a share, the then current price on the Toronto Stock Exchange.
 
 
 8
 During 1966, after public announcement of the oil discovery, Banff stock traded at prices as high at $18 a share.
 
 
 9
 The complaint alleges, in effect, that the defendants, knowing of the oil discoveries and the consequent increase in value of Banff stock, sold 770,000 shares of that stock to Aquitaine and Paribas at vastly inadequate prices as a result of a conspiracy among them to enrich Aquitaine's "affiliates, business associates and friends" at the expense of Banff and its shareholders other than Aquitaine.
 
 
 Summary Judgment
 
 
 10
 The district court's grant of summary judgment against the plaintiff was accompanied by a refusal of his request for discovery. This court has indicated that summary judgment should rarely be granted against a plaintiff in a stockholder's derivative action especially when the plaintiff has not had an opportunity to resort to discovery procedures. See, for example, Subin v. Goldsmith, 224 F.2d 753 (2d Cir.), cert. denied, 350 U.S. 883, 76 S.Ct. 136, 100 L. Ed. 779 (1955); Colby v. Klune, 178 F.2d 872 (2d Cir. 1949); Fogelson v. American Woolen Co., 170 F.2d 660 (2d Cir. 1948). The plaintiff typically has in his possession only the facts which he alleges in his complaint. Having little or no familiarity with the internal affairs of the corporation, he is faced with affidavits setting forth in great detail management's version of what actions were taken and what motives led the affiants to take these actions. Since the facts in such a case are exclusively in the possession of the defendants, summary judgment should not ordinarily be granted where the facts alleged by the plaintiff provide a ground for recovery, at least not without allowing discovery in order to provide plaintiff the possibility of counteracting the effect of defendants' affidavits.
 
 
 11
 Indeed in many stockholder's derivative actions there will be issues as to the knowledge, intent and motive which will require a full trial with an opportunity to observe the demeanor of the witnesses, and to conduct cross-examination in open court. In such cases summary judgment cannot be granted even after discovery has been had. See Subin v. Goldsmith, supra, 224 F.2d at 757. See also Poller v. CBS, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) ("We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."); Cross v. United States, 336 F.2d 431, 434 (2d Cir. 1964); Alvado v. General Motors Corp., 229 F.2d 408, 411-12 (2d Cir. 1955), cert. denied, 351 U.S. 983, 76 S.Ct. 1050, 100 L.Ed. 1497 (1956). (For a discussion of a number of additional cases, see Judge Frank's opinion in the Subin case.)
 
 
 12
 In the present case the plaintiff's allegations constitute a claim that Aquitaine, knowing the true value of Banff stock, used its control over Banff to acquire 500,000 shares at a vastly inadequate price. The allegations have a sufficient factual basis — Aquitaine's control, Aquitaine's knowledge of the oil discovery, the inadequacy of the price paid for the stock — to require at least that the plaintiff be permitted through discovery to develop the evidence to counter defendants' affidavits.
 
 
 13
 
 Plaintiff's Cause of Action Under Section 10-b and Rule 10b-5 of the Securities Exchange Act of 1934
 
 
 
 14
 We hold that the complaint states a triable claim under Section 10(b)[1] and Rule 10b-5[2] of the Securities Exchange Act of 1934 against all defendants except Paribas.
 
 
 15
 As to Paribas it appears that the negotiations for the purchase of treasury stock were arm's length negotiations. There is no reason to believe that Paribas was in possession of any information not available to Banff and, more importantly, there is no reason to believe that Paribas was in any position to influence the judgment of the Banff directors by any improper means. Paribas and the purchasers whom it represented were, so far as appears, unconnected with Banff and unable through ownership of Banff stock or otherwise to bring any pressure on Banff to sell its stock at a price below its true value. For these reasons the dismissal of the complaint as to Paribas is affirmed.
 
 
 16
 The case against the other defendants is a far different one.
 
 
 17
 The issuance by Banff of its stock to Aquitaine was a sale of securities within the meaning of Section 10(b) and Rule 10b-5. The stockholders of Banff may bring a derivative action for damages to the corporation suffered by reason of a violation of Section 10(b) and Rule 10b-5. Ruckle v. Roto Amer. Corp., 339 F.2d 24 (2d Cir. 1964); Hooper v. Mountain States Sec. Corp., 282 F. 2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).
 
 
 18
 In Ruckle v. Roto Amer. Corp., supra, the corporation proposed to issue shares for an inadequate consideration. The new shares were to be issued to or, at least, to be controlled by the president of the corporation. Certain material information was withheld from one of the directors when the board was called upon to approve the transaction. The issuance of the shares under these circumstances was held to be a fraud upon the corporation within the meaning of Section 10(b) and Rule 10b-5. The court said: "in other contexts, such as embezzlement and conflict of interest, a majority or even the entire board of directors may be held to have defrauded their corporation." 339 F.2d at 29.
 
 
 19
 In the present case it is alleged that Aquitaine exercised a controlling influence over the issuance to it of treasury stock of Banff for a wholly inadequate consideration. If it is established that the transaction took place as alleged it constituted a violation of Rule 10b-5, subdivision (3) because Aquitaine engaged in an "act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Moreover, Aquitaine and the directors of Banff were guilty of deceiving the stockholders of Banff (other than Aquitaine). See Pappas v. Moss, 393 F.2d 865 (3d Cir. 1968).
 
 
 20
 It is argued that the agreement to sell Banff stock to Aquitaine was entered into before the results of the oil exploration were known. However it is by no means clear that the letter of Aquitaine's president dated January 5, 1965 resulted in the formation of a binding contract. Moreover in the absence of an opportunity for discovery procedures it cannot be accepted as true that on January 5, 1964 or at the earlier date in December, 1964 when Banff made the offer to sell, the parties were not in possession of sufficient information as to the true value of Banff stock to make the sale at market price a fraud on Banff. In addition, whether Aquitaine's acquisition of the Banff stock on the eve of the completion of the first oil well constituted overreaching presents an issue to be resolved only after an opportunity for further investigation.
 
 
 21
 The order of the district court is reversed as to all defendants except Paribas and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 Sitting pursuant to 28 U.S.C. § 46(c) (1964)
 
 
 [1]
 REGULATION OF THE USE OF MANIPULATIVE AND DECEPTIVE DEVICES
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange —
 * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 [2]
 EMPLOYMENT OF MANIPULATIVE AND DECEPTIVE DEVICES
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.
 (1) to employ any device, scheme, or artifice to defraud,
 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 
 
 
 22
 MEDINA, Circuit Judge (dissenting, with whom LUMBARD, Chief Judge, and MOORE, Circuit Judge, concur):
 
 
 23
 I dissent and adhere to the views expressed in the majority panel opinion of Chief Judge LUMBARD to the effect that, even assuming the contracting parties were possessed of information concerning the oil discovery at the time of the making of the contract to sell to Aquitaine, plaintiff did not make out a case under Rule 10(b)5.
 
 
 24
 The essence of the claim is that, whenever a corporation through action of its directors sells a block of its own stock, a stockholder can maintain an action in the federal courts under Section 10(b) and Rule 10(b)5 by merely alleging that the price was too low or too high, that the directors "knew or should have known" it was too low or too high, sealed with the characterization or opinion of the claimant that this was a "fraud" perpetrated against the corporation. This does indeed open the floodgates. For the result is to transform a simple cause of action against directors for waste or the use of bad judgment in the sale of corporate assets into a federal securities fraud case by judicial fiat. In my opinion the Congress never intended the Securities Exchange Act of 1934 to be intrepreted so broadly as this.
 
 
 25
 We proceeded in the panel opinion upon the assumption that both parties to the transaction of purchase and sale of the Banff treasury stock knew Banff had struck oil because Judge Cooper proceeded upon the same hypothesis. In retrospect it is now apparent that it was a mistake to have made this contrary-to-fact assumption, as it has thrown the whole case out of focus. Accordingly, and in the light of the views expressed in the majority en banc opinion of Judge Hays, it becomes essential to make a more complete statement of the factual background and the issues as framed in the complaint.
 
 
 26
 Confining the discussion to the Aquitaine transaction, as I concur in the disposition of the Paribas charge by the majority, the plaintiff's claim against Aquitaine and the Banff directors as defendants is that at the time of the sale of the Banff treasury stock to Aquitaine the defendants knew that Banff had made a rich strike of oil, that the true extent of the discovery was withheld for about a year so the defendants could make the sale to Aquitaine at a grossly inadequate price "to enrich themelves, business associates, friends and relatives," in order to depress the value of Banff stock on the American Stock Exchange and to maintain the price of the stock at an artificially low level.
 
 
 27
 What is established without a shred of countervailing proof by the summary judgment affidavits on personal knowledge filed by defendants is that the sale was authorized by the Banff directors on December 11, 1964, the offer was accepted in writing by Aquitaine on January 5, 1965, the drilling did not even commence until January 11, 1965 and the first flush of oil appeared on February 6, 1965. The transaction of purchase and sale of the stock was consummated on March 16, 1965, after a short delay caused by tax problems and compliance with the regulations of the American and Toronto Stock Exchanges. These are cold facts supported by documentary proof. The charge of enriching the individual defendants and their business associates, friends and relatives turned out to be just another stab in the dark, as did a similar charge made in the complaint with respect to the Paribas transaction. And thus it now appears that the action taken by the Banff directors and the making of the ensuing contract took place at a time when there was no "inside information" about a rich oil strike and when there was no person anywhere who could know that the first drilling or any drilling in the Rainbow area in the future would be successful.
 
 
 28
 Moreover, information concerning the discovery of oil on February 6, 1965 was released to the public on February 8. On March 18, 1965, after the drilling of the first well was completed on March 17, a further press release was issued stating that no further information would be disclosed in the immediate future; and on April 20 an additional press release announced to the public that the company was taking advantage of the Alberta law permitting it to withhold information concerning its discovery for one year to reduce competition from other companies in bidding on government oil lands in the discovery area. Later other wells were drilled and extensive purchases were made of millions of acres of land in the vicinity and in other places in Canada where it was hoped similar subsurface confirmations existed. Even plaintiff does not suggest that the public or the shareholders of Banff should have been informed of these developments, as such disclosure would have deprived Banff of the undoubted benefits conferred by the Alberta law.
 
 
 29
 What the case thus boils down to is the fact that Aquitaine owned a controlling interest in Banff. And because of this circumstance the majority holds that full discovery proceedings should be permitted to probe the minds of the defendants and lay bare their "motives," because plaintiff has "little or no familiarity with the internal affairs of the corporation."
 
 
 30
 What this amounts to is giving carte blanche to every holder of a few shares in any corporation whose stock is traded on the New York or American stock exchanges to give his imagination full rein in the making of any sort of extravagant charges, no matter how ill founded in fact they may be, and then, when faced with a summary judgment motion based upon personal knowledge and documentary proof, say simply "I know nothing whatever about the matter but hope my lawyer will find something if we conduct extensive discovery proceedings and compel the defendants to produce their complete files." This, while doubtless not so intended, is in my judgment nothing short of a standing invitation to blackmail and extortion. It is perfectly apparent that the expense of such discovery proceedings to the defendants, especially when they are foreigners as in this case, will be enormous; and a plaintiff and his lawyer under these circumstances would seem to have some justification for hoping they will be bought off in one way or another, despite the falsity of the allegations in the complaint. And all this under the aegis of Rule 10(b)5! This does not seem to be a very practical way of reducing congestion in the federal courts.
 
 
 31
 Accordingly, I would affirm the judgment appealed from in its entirety.