**Knute SWANSON, Plaintiff-Appellant,**

v.

**AMERICAN CONSUMER INDUSTRIES, INC., United States Cold Storage Corporation and Peoria Service Company, Defendants-Appellees.**

**No. 17255.**

United States Court of Appeals
Seventh Circuit.

Aug. 13, 1969.

---

Richard Orlikoff, Arthur T. Susman, Chicago, Ill., Thomas V. Cassidy, Peoria, Ill., for plaintiff-appellant, Orlikoff, Prins, Flamm & Susman, Chicago, Ill., of counsel.

Edward J. Wendrow, Frank O. Wetmore II, John W. Stack, Chicago, Ill., Eugene L. White, Peoria, Ill., Winston, Strawn, Smith & Patterson, Chicago, Ill., Kavanagh, Scully, Sudow & White, Peoria, Ill., for defendants-appellees.

Before SWYGERT, CUMMINGS and KERNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff, an Illinois resident, is a stockholder of defendant Peoria Service Company ("Peoria"), a dissolved Illinois corporation that formerly operated two cold storage warehouse facilities in Peoria, Illinois. His June 1965 complaint purports to be brought derivatively on behalf of Peoria and also on behalf of himself and all other similarly situated stockholders. In addition to the nominal defendant, Peoria, the complaint names as a defendant United States Cold Storage Corporation ("U. S. Cold"), a Delaware corporation owning 87% of Peoria's stock and operating cold storage warehouses elsewhere and also conducting an ice and fuel oil business. The third defendant is American Consumer Industries, Inc. ("ACI"), a diversified New Jersey corporation owning 90% of U. S. Cold stock and operating cold storage warehouses, manufacturing ice and selling a wide variety of consumer goods.

Alleging diversity of citizenship and asserting jurisdiction under the Securities Exchange Act of 1934, plaintiff sought to enjoin the sale of substantially all of Peoria's assets to ACI and to rescind a reorganization agreement be-

tween those companies for violations of federal law and Illinois common law. Plaintiff also sought to recover "all damage sustained by Peoria." The complaint asserted that the reorganization plan and related activities involved manipulative and deceptive devices and that the proxy materials were misleading and omitted to state material facts, in violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 thereunder (17 C.F.R. § 240.-10b–5).

The district court held that the action could not be maintained as a class action because the claims of the plaintiff were not "typical of the claims or defenses of the class" and because the class was not so numerous that joinder of all members was impracticable within the meaning of Rule 23 of the Federal Rules of Civil Procedure. Subsequently summary judgment was rendered for defendants on the Securities Exchange Act cause of action without passing upon the merits of plaintiff's common law action or upon defendants' motion to dismiss the derivative action.

The pertinent facts are disclosed in the district court's opinion which is reported in 288 F.Supp. 60. It appears that Peoria had 81,500 shares outstanding and had paid no dividends in recent years. Beginning in 1961, ACI acquired an 87% interest in Peoria through exchanging one share of ACI stock for each nine shares of Peoria stock and through purchasing additonal shares at $3.00 per share. A year later, ACI sold its Peoria shares to U. S. Cold for the same price. After 1961, ACI elected a majority of the boards of directors of U. S. Cold and Peoria. Joseph S. Robinson was the chief executive officer of the three companies.

The district court found that from 1961 through 1964, Peoria unsuccessfully attempted to obtain financing for a new cold storage warehouse facility. On March 11, 1965, ACI and Peoria entered into a reorganization plan providing for the transfer of substantially all of the assets of Peoria to ACI in return for 16,319 shares of ACI stock, stated to be worth "not less than $285,582.50," and assumption of Peoria's liabilities. This exchange ratio was one share of ACI for five shares of Peoria, and the reorganization plan was of course subject to the approval of Peoria stockholders.

A few days later, a notice of a special stockholders' meeting was sent to Peoria's stockholders, calling for a March 31 meeting to consider the reorganization plan and the liquidation of Peoria thereunder.[1] A copy of the reorganization plan was enclosed with the notice, along with a letter from Peoria's president. This letter outlined the proposed stock exchange ratio and mentioned that Peoria would be dissolved. The letter stated that Peoria's board recommended a favorable vote because:

(1) ACI stock is readily marketable, whereas Peoria stock is of a "relatively marketless nature";

(2) ACI has been paying regular dividends, whereas Peoria "is unable to declare or pay a dividend";

(3) Peoria's stockholders would become stockholders in a larger, more diversified corporation and would continue to participate in earnings attributable to Peoria's assets which, through ACI's greater financial resources, might be "modernized or rebuilt."

The letter stated that a two-thirds vote was needed and that U. S. Cold owned 87% of Peoria's stock and would cast its stock in favor of approval. Peoria stockholders were also told that dissenting stockholders had appraisal rights under Section 73 of the Illinois Business Cor-

---

1. Plaintiff was unsuccessful in seeking a temporary injunction against the holding of this meeting (Swanson v. Peoria Service Company, 65 CH 1656 (Circuit Court of Cook County, Illinois)) and voluntarily dismissed that action after filing this federal suit in the Northern District of Illinois, which was later transferred to the Southern District of Illinois for "the convenience of parties and witnesses" and in the "interests of justice."

poration Act (Ill.Rev.Stats.1967, ch. 32, § 157.73).

At the stockholders' meeting, plaintiff, with 3.3% interest in Peoria, orally voted his 2,703 shares against the reorganization plan and the dissolution of Peoria.[2] However, U. S. Cold's 70,539 shares, together with 783 other shares, were voted in favor of both propositions, which were therefore declared adopted.

Peoria's assets were thereafter transferred to ACI and Peoria was dissolved on August 23, 1965. ACI sold Peoria's assets for a total of $254,231.50, and in September 1966 completed the building of a new cold storage warehouse in East Peoria, Illinois, for $1,318,581 (including land). ACI sold this property to U. S. Cold for its appraised value of $1,586,405 on June 30, 1967.

Pursuant to the reorganization plan, U. S. Cold's 70,539 shares of Peoria and 3,746 shares held by 60 other shareholders were exchanged for ACI shares. Including plaintiff, 40 shareholders, representing 7% of the outstanding shares of Peoria, failed to effect this exchange after receiving appropriate notice.[3]

*Violation of the Securities Exchange Act and Rule 10b–5*

 The nub of the complaint is that defendants effected the exchange of Peoria's assets for ACI stock by means of deceptive proxy statements and the failure to reveal material information which would make the statements made not misleading to Peoria's minority shareholders. It is no longer open to question that the exchange of shares in connection with a merger or sale of assets constitutes a "purchase or sale" within the meaning of Section 10(b) and Rule 10b–5. SEC v. National Securities, Inc., 393 U.S. 453, 467–468, 89 S.Ct. 564, 21 L.Ed.2d 668; Dasho v. Susquehanna

Corp., 380 F.2d 262, 269 (7th Cir. 1967) (concurring opinion), certiorari denied, Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470. The *National Securities* decision also makes clear that the fact that the vehicle for the accomplishment of a fraudulent scheme may be proxy materials subject to regulation under Section 14(a) is not a bar to the application of the broad anti-fraud provisions contained in Section 10(b) and Rule 10b–5. 393 U.S. at p. 468, 89 S.Ct. 564.

 Peoria's board recommended that its stockholders vote in favor of approval of the reorganization plan, "being confident that it is fair to, and in the best interests of the [Peoria Service] Company and all its shareholders." As in our recent decision in Mills v. Electric Autolite Co., 403 F.2d 429, 432 (7th Cir. 1968), certiorari granted, 394 U.S. 971, 89 S.Ct. 1470, 22 L.Ed.2d 752, "Although the proxy statement was, in form, addressed to all shareholders, it was, in realistic terms, intended for the minority shareholders." The proxy materials did reveal that U. S. Cold owned 87% of Peoria and intended to vote its shares in favor of the sale, but it was not disclosed that the potential purchaser, ACI, was the parent of U. S. Cold and that Peoria's board, which purported to give disinterested advice to the minority shareholders, was comprised solely of ACI officers and directors. The conflict of interest of the Peoria directors was thus concealed, nor had it been disclosed in other proxy materials with respect to the March 31, 1965, shareholders' meeting. As in *Mills, supra,* "the board was not free to state its recommendation and opinion favoring the merger without giving similar emphasis to the relationship between the directors and the other party to the bargain" (403 F.2d at p. 434).

2. At the meeting, plaintiff announced that he was abstaining from voting his proxies for 1508 other shares. Neither plaintiff nor any other Peoria stockholder availed himself of the appraisal rights provided by the Illinois Business Corporation Act.

3. Fifty-one other Peoria stockholders, representing 1.9% of Peoria's outstanding shares, have not provided proper mailing addresses and therefore have not received notice of their right to exchange Peoria shares for ACI shares and have failed to make such an exchange.

Moreover, although the proxy materials did indicate the value of the ACI shares which were to be exchanged for Peoria's assets, no appraisal of the value of Peoria's assets was furnished, and its December 31, 1964, audited balance sheet showing a book net worth of $498,589, exclusive of goodwill, was withheld. No type of balance sheet or profit and loss statement was submitted. Furthermore, the Peoria shareholders were told that their stock was "relatively marketless," and no data concerning the value of Peoria shares was offered.[4] Finally, no mention was made of ACI's intention to dispose of Peoria's physical plant and to construct a new cold storage plant to serve the Peoria market. Instead, the proxy material merely advised Peoria's shareholders that ACI's financial resources might enable Peoria's "assets to be modernized and to be rebuilt, thus contributing to their efficiency." Thus the fact that ACI planned to take advantage of Peoria's corporate opportunity to exploit the advantages of the local market rather than guarantee financing so that Peoria could undertake this task itself was concealed from the minority shareholders. These facts were material to the shareholders' evaluation of the prospects of their company, the value of their respective equities in that company, and the desirability of exchanging this equity for ownership of ACI's shares. We conclude as in the *Mills* case, *supra*, that these proxy statements were misleading in material respects and were deceptive as a matter of law.

Defendants urge that even if the proxy materials were deceptive and misleading, the reorganization plan would still have been approved in view of U. S. Cold's ownership of 87% of the Peoria stock. To support their argument that there is an absence of causation between the deception and the injury claimed, defend-

ants rely primarily on Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y. 1965).[5] That case was decided principally under Section 14(a) and was concerned with the existence of "but for" causation of a merger where the majority shareholder held more than the necessary number of shares to insure approval. See also Mills v. Electric Autolite Co., 403 F.2d 429, 435–436 (7th Cir. 1968), certiorari granted, 394 U.S. 971, 89 S.Ct. 1470, 22 L.Ed.2d 752. No deception of minority shareholders was alleged in the complaint. Also, it appears from the opinion that Delaware law provided no appraisal remedy for dissenting shareholders in a sale of assets situation such as that involved in *Barnett*. The same is true of Adair v. Schneider, 293 F.Supp. 393 (S.D.N.Y. 1968), which relies on *Barnett*.

 In the present case, on the *other hand, we deal with a complaint under Section 10(b) and Rule 10b–5. As stated in SEC v. National Securities, Inc., 393 U.S. 453, 462, 89 S.Ct. 564, 570, 21 L.Ed.2d 668: "The gravamen of the complaint was the misrepresentation, not the merger." Thus, unlike Section 14 cases, we are not concerned primarily with whether the merger or sale of assets could have been effected absent the deceptive statements, but rather with injury to shareholders or to the corporations which results from the use of deceptive devices proscribed by Rule 10b–5. See Globus, Inc. v. Jaroff, 266 F.Supp. 524, 530 (S.D.N.Y.1967). To apply the Barnett rationale to the present claim under Section 10(b) and Rule 10b–5 would be to sanction all manner of fraud and overreaching in the fortuitous circumstance that a controlling shareholder exists. The power to effect a given result certainly does not negative all possibility of injury resulting from the*

---

4. Defendants conceded that the market price of Peoria stock was listed in the March 1, 1965, issue of The National Monthly Stock Summary, and an excerpt from that publication appended to plaintiff's principal brief in this Court indicates that Peoria stock had bid prices

ranging from 4½ to 5⅝ during the November 1964–February 1965 period.

5. The *Barnett* decision was criticized for this holding in Comment, 51 Iowa L.Rev. 515, 520–521 (1966).

fraudulent or manipulative use of that power.

Unlike *Barnett,* in the present case the minority shareholders were entitled to appraisal rights under Illinois law. It may well be that the misstatements and omissions contained in the proxy statements caused some Peoria shareholders to approve the sale, thus losing their statutory appraisal remedies. Other minority shareholders who failed to vote for or against the plan may nevertheless have been lulled into sleeping on their dissenters' rights. We are not prepared to sanction a rule of causation which would presume that full disclosure to minority shareholders could have no transactional function in corporate affairs.[6] Confronted by the objections and potentially expensive appraisal rights of minority shareholders, the directors of Peoria and their alter egos, ACI and U. S. Cold, might well have chosen to alter the plan of reorganization or abandon it entirely.[7] "The vote is not legally predetermined simply because it seems practically predictable. * * * it is not legally possible to decide what legal consequences flow from the informational defects in the meeting by asserting that the meeting would have ended in the same resolutions no matter what the views or votes of the minority." Laurenzano v. Einbender, 264 F.Supp. 356, 362 (E.D.N.Y.1966).

■ Nor does the presence of a controlling shareholder negative as a matter of law the possibility of injury to the corporation, which may be remedied by means of a derivative action. Here the allegations in the complaint amount to a charge that the corporation is being raided and its assets squandered in order that its principal shareholder might obtain for itself the business and corporate opportunities available and properly belonging to the corporation. Cf. Dasho v. Susquehanna Corp., 380 F.2d 262, 270 (7th Cir. 1967) (concurring opinion), certiorari denied, Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470; Ruckle v. Roto American Corp., 339 F.2d 24, 29 (2d Cir. 1964). As. in Mills v. Electric Autolite Co., 403 F.2d 429, 435 (7th Cir. 1968), certiorari granted, 394 U.S. 971, 89 S.Ct. 1470, 22 L.Ed.2d 752, "there is an issue for trial with respect to the causal relationship between the deficiency in the proxy statement" and the Peoria sale.

■ Defendants next assert that no injury can be shown because any corporate opportunities or going concern value of which the Peoria shareholders might have been deprived is retained by them by virtue of their continuing equity position in ACI. The short answer is that if the allegations of the complaint are proved, the Peoria shareholders were entitled to a more favorable exchange ratio than they were granted and may have had their equity position unfairly diluted. Moreover, as recognized by the Supreme Court in SEC v. National Securities, Inc., 393 U.S. 453, 467, 89 S.Ct. 564, 21 L.Ed. 2d 668, the fraudulent substitution of shareholder status in one company for the same status in another may constitute a cognizable legal injury in and of itself.

■■ It is also contended that Peoria's minority shareholders waived any rights under Section 10(b) and Rule 10b–5 by failing to exercise their Illinois appraisal rights. Of course such appraisal remedies can have no bearing on the propriety of the derivative action for they offer no redress for the wrongs alleged to be suffered by the corporation.

---

6. Consistently with our appraisal in the present case, Professor Stanley Kaplan has predicted a gradual abandonment of the doctrine espoused in the *Barnett* case in "Shareholder Attacks on Mergers and Acquisitions Under Federal Securities Laws," 50 Chicago Bar Rec. 441, 443–444, 452 (1969). It seems likely that *Barnett* does not represent the state of the law in the Second Circuit. See Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc).

7. See Comment "Shareholders' Derivative Suit to Enforce a Corporate Right of Action Against Directors Under SEC Rule 10b–5," 114 U.Pa.L.Rev. 578, 582 (1966).

Nor is it clear that appraisal rights would offer complete relief for a complaint which asks that a merger be unscrambled. In our judgment the anti-fraud policies expressed in Section 10(b) and Rule 10b–5 do not depend on the non-existence or exhaustion of state remedies.[8] See SEC v. National Securities, Inc., 393 U.S. 453, 467, 89 S.Ct. 564, 21 L.Ed.2d 668.

### Propriety of Class Suit

■ As noted earlier, the district court granted defendants' motion to dismiss the class action on the grounds that (1) plaintiff's claim was not "typical of the claims of the class" and (2) the class was not so numerous that joinder of all members was impracticable. These are two of the four requisites for the maintenance of a class action under Rule 23 of the Federal Rules of Civil Procedure. In our view, both requisites were satisfactorily met. It appears that 60 minority shareholders have effected the exchange for ACI shares, 40 have not done so, and an additional 51 did not receive notices of the meeting and their whereabouts are presently unknown. The district court held that plaintiff could represent only the second group of shareholders and that this group was not sufficiently large to justify resort to the class action device.

We noted above that some minority shareholders may have accepted the offer as a result of the deception alleged, and that others may have failed to vote as a result of the notice, thus losing their right to seek appraisal for the fair value of their shares. The central question common to all of the minority shareholders is that of deception, and in our opinion this issue outweighs the minor variations among the shareholders based on the degree of reliance upon the notice of meeting. See Green v. Wolf Corp., 406 F.2d 291, 300–301 (2d Cir. 1968). As there observed, the utility of Rule 23 would be destroyed if a class action were denied "simply because all of the allegations of the class did not fit together like pieces of a jigsaw puzzle" (406 F.2d at p. 300).

■ As to the district court's conclusion that this class was not sufficiently numerous to justify the use of the class device, we recently approved the maintenance of a class suit in a Rule 10b–5 case where only two out of 800 purchasers of stock filed actions and no additional members of the alleged class sought to intervene. Hohmann v. Packard Instrument Company, 399 F.2d 711 (7th Cir. 1968). This case involves 151 minority stockholders of Peoria. Certainly that is a sufficient number to permit a class suit to proceed.[9] To require a multiplicity of suits by similarly situated small claimants would run counter to one of the prime purposes of a class action. (See 399 F.2d at p. 715.)

### Propriety of Derivative Action

■ Although defendants filed a motion to dismiss the derivative action, the district court's opinion did not pass upon that point, preferring to treat the motion as one for summary judgment. See 288 F.Supp. at p. 61. In this Court, the defendants have not pressed the derivative question. Nevertheless, we note that in Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc), the Second Circuit reaffirmed that a derivative action may properly be used to rectify a fraud upon a corporation where, as here, its directors are in a position of conflicting interest or loyalty and were aware that the transaction was grossly

---

8. Indeed, there appears to be a trend in state corporation law toward relegating minority shareholders in publicly held corporations to the remedies supplied by the market place, of which the *federal* securities laws are an important part. See Del.Code Ann. Tit. 8, § 262(k) (1968 Cum.Supp.).

9. Even if the class were limited to 40 stockholders, as proposed by the court below (288 F.Supp. at p. 61), that is a sufficiently large group to satisfy Rule 23(a) where the *individual* members of the class are widely scattered and their holdings are generally too small to warrant undertaking individual actions.

unfair to the corporation. The allegations of the present complaint support a derivative action even more strongly than in *Schoenbaum*. Since this action meets the requirements of Rule 23.1 of the Federal Rules of Civil Procedure as to derivative actions, plaintiff may properly maintain it as such.

*Illinois Common Law Cause of Action*

 In addition to the claim under the federal securities laws, the complaint alleges a breach of fiduciary duty by defendants giving rise to an Illinois common law cause of action. The district court disposed of this point by stating that it was waived when plaintiff passed up his appraisal rights (288 F.Supp. at p. 64). Defendants seek affirmance on the theory that the appraisal right conferred by Section 73 of the Illinois Business Corporation Act "controls and no independent Illinois common law cause of action for breach of fiduciary duty exists." This argument cannot affect the derivative action that has been asserted on behalf of Peoria, nor can it affect minority stockholders who did not exercise their appraisal rights as a result of the alleged fraud. Finally, plaintiff is not seeking only a judicial valuation of his equity interest in Peoria. The complaint seeks rescission of the sale, reincorporation of Peoria and judgment "for all damage sustained by Peoria." Thus plaintiff is seeking the "value, plus" that defendants insist is required for the maintenance of an independent suit under Illinois law. This complaint satisfies Opelka v. Quincy Memorial Bridge Co., 335 Ill.App. 402, 82 N.E.2d 184 (1948) and Robb v. Eastgate Hotel, 347 Ill.App. 261, 106 N.E.2d 848 (1952), because it alleges that appraisal would be an inadequate remedy and that other remedies are required to relieve the minority stockholders from the abuses flowing from the fraudulent activities of defendants. Therefore, the minority stockholders are entitled to a trial on the fact issues as to defendants' purported violation of fiduciary duties.

We have considered plaintiff's contentions that the transfer to the Southern District of Illinois was improper and that he was not given a fair hearing below and deem them unpersuasive.

Reversed and remanded for trial.

SWYGERT, Circuit Judge (dissenting).

I would affirm for the reasons stated by the district judge in his opinion. Swanson v. American Consumer Industries, 288 F.Supp. 60 (S.D.Ill.1968).