435 F.2d 510
 Fed. Sec. L. Rep. P 92,880
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
FIFTH AVENUE COACH LINES, INC., Victor Muscat, Edward Krock,
Roy M. Cohn, Defendants-Appellants, and Thomas A.
Bolan, Defendant.
 Nos. 137-140, Dockets 33119-33122.
 United States Court of Appeals, Second Circuit.
 Argued Oct. 27, 1970.
Decided Dec. 8, 1970.
 
 Myron J. Greene, New York City (Millard & Greene, and Howard R. Udell, New York City, of counsel), for defendant-appellant Fifth Avenue Coach Lines, Inc.
 Murray I. Gurfein, New York City (Goldstein, Gurfein, Shames & Hyde, and Mel P. Barkan, New York City, of counsel), for defendant-appellant, Victor Muscat.
 Roy M. Cohn, pro se.
 Theodore Sonde, Asst. Gen. Counsel, S.E.C., Washington, D.C. (Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Associate Gen. Counsel, and Kathryn L. Powers, Atty., S.E.C., Washington, D.C., of counsel), for plaintiff-appellee.
 Before MOORE, FRIENDLY and ADAMS,* Circuit Judge:
 ADAMS, Circuit Judge:
 
 
 1
 This appeal raises important questions regarding the application of the Investment Company Act of 1940 ('the 1940 Act'), 15 U.S.C. 80a-1 et seq. As we view the case, the central issue is whether Fifth Avenue Coach Lines, Inc. ('Fifth') had become an investment company within the meaning of 3(a)(1)[1] of the 1940 Act (15 U.S.C. 80a-3 (a)(1) by June 30, 1967. Also presented is the question whether an injunction prohibiting further violations of 10(b) of the Securities Exchange Act of 1934 ('the 1934 Act'), 15 U.S.C. 78j(b), is justified against the defendants, Victor Muscat and Roy M. Cohn.
 
 
 2
 The Securities and Exchange Commission ('SEC') sought an injunction[2] in the District Court for the Southern District of New York against the individual defendants to prevent further violations of the 1934 Act and the 1940 Act, and requested the appointment of a receiver for Fifth. The Honorable Edward C. McLean, United States District Judge, in a decision at 289 F.Supp. 3 (1968), found Fifth to be, as of June 30, 1967, an investment company which, because it had not registered under the 1940 Act, was acting in violation of 7(a) of the Act (15 U.S.C. 80a-7(a)).[3]
 
 
 3
 Fifth's officers, directors, and agents, including the defendants, were found to be responsible for the failure of Fifth to register under the 1940 Act, and were enjoined from various activities which might be in violation of the Act. The Court found that Muscat, Cohn and Edward Krock also violated 10(b) of the 1934 Act in a transaction between Fifth and an affiliated company, Gray Line Corporation ('Gray Line'),[4] and enjoined these defendants from further violations of that Act.[5] The District Court appointed for Fifth a receiver, who registered it as an investment company under the 1940 Act, and who has supervised Fifth's operations for the past two years. Judge McLean's order extended beyond the time of Fifth's registration, and has continued to restrict the activities of the individual defendants.[6]
 
 
 4
 Fifth has appealed from the portion of the District Court's judgment declaring it to be an investment company, and from the order appointing a receiver. Muscat has appealed from the segment of the order enjoining violations of 10(b) of the 1934 Act. The scope of Cohn's appeal is broader, apparently attacking both the Exchange Act portion and the Investment Company Act portion of Judge McLean's injunction against him. Defendant Thomas A. Bolan did not appeal because he was not enjoined from doing anything after the registration of Fifth as an investment company. Krock appealed but withdrew such appeal before oral argument. The facts are recited in extenso in the District Court's opinion, and only those necessary to our decision will be repeated here. We have, however, set forth in an appendix a partial list of the transactions which the SEC alleges are violations of the 1940 or 1934 Acts.
 
 
 5
 Until March, 1962, Fifth operated in New York City one of the nation's largest privately owned municipal transit systems. Fifth's transformation from a company primarily engaged in the transportation business began in March, 1962, when the City of New York acquired by condemnation all the bus lines of Fifth within the City. Since that time, Fifth and the City have been litigating Fifth's claims for compensation for such taking. The City satisfied Fifth's claim with respect to physical assets in October, 1966, and only recently settled Fifth's claims with respect to going concern assets and other intangibles. From 1962 to 1966, however, Fifth had little to do except to litigate these claims and to resolve old tort claims remaining from its period as an operating company. The receipt in 1966 of an initial condemnation award of more than $11,500,000, free of all liabilities, consequently breathed new life into Fifth.
 
 
 6
 After the City had taken Fifth's operating assets, a group composed of Krock, Muscat and Robert L. Huffines, Jr., acquired control of Fifth through a pyramid of interlocking shareholdings at the peak of which rested Defiance Industries, Inc. (Defiance). In 1966, Defiance had only one class of stock outstanding, consisting of 892,894 shares of common stock. Of this total, Muscat owned about 27% And Huffines about 9%. Huffines sold his Defiance stock to William P. Ruffa, an attorney in the firm of Saxe, Bacon & Bolan, to which Cohn is 'of counsel.' Ruffa, however, acted merely as nominee for the stock which was owned by Muscat and Cohn. As of December 12, 1966, Cohn owned 7% Of Defiance, Bolan and Krock each owned 1%, and Muscat 27%, totaling for this control group 36% Of Defiance's stock.
 
 
 7
 Defiance, in turn, owned about 32% Of BSF Company, a registered investment company. BSF owned 20% Of Gray Line, an inactive corporation. BSF also owned 9% Of Fifth, and Gray Line owned 23% Of Fifth, the only substantial asset of Gray Line. Surface Transit, Inc., a wholly-owned subsidiary of Fifth, owned 33% Of Gray Line and Fifth itself owned 45% Of Gray Line. Thus, in this circle, BSF, Fifth and Surface together owned 98% Of Gray Line, while BSF and Gray Line owned 32% Of Fifth. The remainder of Fifth's stock, however, was owned by about 2,000 public shareholders. Further control over BSF was obtained by Cohn and Bolan through the purchase of 18,735 shares of BSF stock on July 6, 1966, Cohn taking 16,735 shares and Bolan 2,000 shares. Moreover, when Fifth received its condemnation award from the City, it purchased about 3.4% Of Defiance's stock. There were several other companies which eventually touched Fifth in the pyramid topped by Defiance, but the above describes the basic skeleton.
 
 
 8
 In addition to being officers and directors of many of the other companies in the group, Muscat, Bolan, and Krock formed the executive committee of Fifth's Board of Directors. Muscat was president of the company, Bolan was secretary, and Krock the treasurer. Others on the ten-man board of directors included Krock's personal physician, Krock's son-in-law, who was a director of BSF and American Steel and Pump Corp. (57% Owned by BSF), and a vice president and controller of American Steel. Saxe, Bacon & Bolan were general counsel for most of the companies in the group including Fifth. Cohn was neither an officer nor director of any of the companies, but the District Court found him to be an active participant in controlling the affairs of Fifth and Defiance.
 
 
 9
 In a letter dated July 28, 1966, accompanying Fifth's annual report to its shareholders for 1965, Muscat (as president of the company) stated that as soon as the condemnation award was paid by the City, 'the Company intends to make proper and advantageous investments for the benefit of the Company.' The annual meeting was held on August 10, 1966, and Cohn there read another letter from Muscat to the shareholders stating in part:
 
 
 10
 'There are bargains available today in the form of investments in transportation, in related fields, and in brand new fields-- bargains which others cannot take advantage of because they do not have the cash available.
 
 
 11
 'We have been actively exploring several of these opportunities and we will be ready to move forward boldly when the funds are paid over to us. 'We have waited more than four years. But we will be in a position to put the money to work profitably for you as soon as it is received.'
 
 
 12
 Cohn then rejected a proposal made by Lewis Gilbert, an active shareholder in many companies, that the proceeds of the condemnation award be immediately distributed to Fifth's shareholders.
 
 
 13
 When the $11.5 million condemnation funds were received from the City in October, 1966, Fifth immediately began its investing program, purchasing within a month stock in Wilson Brothers, Standard Packaging, Horn & Hardart, Defiance Industries, American Steel and Pump, Republic Corporation and others. In December, Fifth made the first of several tender offers for the stock of Austin, Nichols & Company. By December 31, 1966, Fifth had placed more than $8 million of its $11.5 million either in stocks or time deposits, some of the above investments having been sold and others purchased. Further investments and trading reduced available cash to $843,000 by June 30, 1967.
 
 
 14
 The District Court found that as of June 30, 1967, Fifth had become an investment company within the meaning of 3(a)(1) of the 1940 Act. Fifth contends it was not engaged in the business of investing or trading in securities, but was seeking ventures in which to purchase control for the purpose of operating companies. Judge McLean found that while Fifth's intention may have been as stated, Fifth was 'markedly unsuccessful in carrying out that policy' (having gained control only of Mercantile National Bank of Chicago), and that by June 30 'the only business that it can fairly be found to be primarily engaged in was the business of investing in securities.' The District Court did not find Fifth to be an investment company at an earlier date because Judge McLean thought 'a company which has suddenly come into possession of a substantial amount of cash is entitled to a reasonable time to decide what to do with it without violating the Investment Company Act.'
 
 
 15
 Professor Louis Loss has noted that 'the problems of the (investment company) industry flow from the very nature of the assets of investment companies. Because those assets are usually liquid and readily negotiable, control of the companies' large funds of cash and securities (offer) many opportunities for exploitation by unscrupulous management.'[7]
 
 
 16
 Pursuant to 30 of the Public Utility Holding Company Act of 1935, 15 U.S.C. 79z-4, the SEC made a four-year study, completed in 1941, of investment companies. In Part One of its Report, the SEC undertook to classify investment companies-to distinguish between companies owning securities in other corporations and those in the business of investing in other corporations.[8] The first group of companies includes those with holdings primarily in wholly-owned or non-wholly-owned subsidiaries (defined as companies owned 50% Or more). The business of such companies may be considered to be the same as that of their subsidiaries, and the SEC excluded such companies from the scope of its study. On the other hand, companies with investments primarily in diversified securities or corporations in which they have working control (defined as ownership of 10% To 50% Of the outstanding voting power) were found to be part of the industry needing regulation. Where this line between the management of subsidiaries (the characteristic mode of operation of 'conglomerate' corporations), and the control of other companies becomes hazy, the Report suggested an analysis of other factors, including the degree of integration or non-integration of the company and its affiliates, the volume of trading by the company in its portfolio securities, the frequency of shifts in portfolio securities, and the representations made to the public or its shareholders regarding the nature of its business. The Report examined in detail the activities and abuses of such 'quasi-holding' companies, and revealed the same type of abuses which were found to have occurred in the management of Fifth.[9]
 
 
 17
 Fifth argues that from the time it received the proceeds of the condemnation award from the City, it was endeavoring to gain operating control of companies-- to become a conglomerate-- and that it therefore should not be denominated an investment company.[10] However, when Fifth's statements to its shareholders are viewed against the backdrop of Fifth's actual securities trading and Judge McLean's findings that 'Fifth never came close to achieving that objective' (gaining control of Austin, Nichols), and that 'Fifth has been markedly unsuccessful in carrying out * * * (its) policy' of obtaining control of other companies, Fifth's activities come within the ambit of 3(a)(1) of the Act.
 
 
 18
 From an historical viewpoint, there is nothing surprising about considering Fifth to be an investment company. The transformation of an industrial company into an investment company, which occurred with Fifth, was anticipated by events preceding the enactment of the 1940 Act.[11] For example the Adams Express Company controlled large portions of the nation's express forwarding business before World War I. The United States Government, however, after entering the War, took over all express business in the country and placed it in the American Railway Express Company, an entity formed by the Government. As a result of this transaction-- somewhat analogous to the taking of Fifth's business by New York City-- Adams Express became an investment-holding company, rather than an operating company.
 
 
 19
 The SEC here argues that we should hold Fifth to have been an investment company within the meaning of 3(a)(1) of the Act as early as October, 1966, the time at which Fifth received the first condemnation proceeds. While the evidence might support a holding that Fifth became an investment company by December 31st, 1966, that issue is not before us. Since the SEC did not cross-appeal from Judge McLean's order, our power is limited by the doctrine expressed in Justice Cardozo's opinion in Morley Construction Co. v. Maryland Casualty Company, 300 U.S. 185, 191, 57 S.Ct. 325, 327, 81 L.Ed. 593 (1937):
 
 
 20
 'Without a cross-appeal, an appellee may 'urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.' United States v. American Railway Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087. What he may not do in the absence of a cross-appeal is to 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.' Ibid. The rule is inveterate and certain.'
 
 
 21
 See also Cook v. Hirschberg, 258 F.2d 56 (2d Cir. 1958). Here, Judge McLean's decree stated in section one that 'Fifth * * * has been an investment company under the * * * Act since June 30, 1967 * * *.' Were we to modify this portion of the order, the individual defendants could well be disadvantaged in that several of the transactions described in Judge McLean's opinion (see 289 F.Supp. at 20-23) might then become actual violations of the 1940 Act, rather than evidence only of a propensity to violate the Act in the future.
 
 
 22
 The District Court also found Fifth to be, as of June 30, 1967, an investment company within the meaning of 3(a)(3) of the 1940 Act (15 U.S.C. 80a-3(a)(3)).[12] 3(a)(3)).[12] Because the District Court found that Fifth was an investment company within 3(a)(3) as of a date no earlier than the time it became an investment company within 3(a)(1), and because we have already held Fifth to be an investment company within 3(a)(1), we need not reach the 3(a)(3) issue.
 
 
 23
 The next question presented is the propriety of that portion of the District Court's order enjoining Muscat, Krock and Cohn from further violations of 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder. Judge McLean bottomed this part of his order upon a transaction between Fifth and Gray Line involving the stock of Gateway National Bank of Chicago. On December 15, 1966, Fifth acquired 6% Of the common stock of Gateway, the agreement being consummated for Fifth by Ruffa, Fifth's vice president. Thereafter, Saxe, Bacon & Bolan (the firm with which Ruffa was associated and to which Cohn was 'of counsel'), decided Fifth's control of both Gateway and Mercantile National Bank of Chicago might violate the Bank Holding Company Act, 12 U.S.C. 1841 et seq. Accordingly, Gray Line was chosen as the receptacle for the Gateway stock. As noted before, Gray Line engaged in no active business, and had no significant assets other than its 23% Ownership of Fifth's stock. Muscat was then chairman of the Board of Directors and president of Fifth, and Krock was a member of its board and treasurer. In addition, Muscat was chairman of the Board of Directors of Gray Line, and Krock was a director and the president of Gray Line. Ruffa was vice president of both companies. In January, 1967, Fifth sold to Gray Line its stock in Gateway at cost-- $717,200-- under an agreement providing for cash payment. Krock signed this contract for Fifth, and Ruffa for Gray Line. Silfen, another associate of Saxe, Bacon & Bolan, testified that Cohn and Muscat participated in the decision to sell the Gateway stock. Neither one denied in the District Court his involvement in the transaction. No time for payment was fixed; no provision for security was included; no payment has been made. Fifth and Gray Line amended the agreement on July 13, 1967 to provide for a 10% Cash payment and the delivery of ten notes by Gray Line to Fifth to cover the remainder of the obligation. Still no cash was paid and no notes delivered. Only after this suit was brought did Fifth arrange for a security interest in the Gateway stock.
 
 
 24
 The SEC argues this sale of Gateway stock to Gray Line-- which was not revealed to nor approved by Fifth's Board of Directors at the time-- constituted a fraud against Fifth and its shareholders because those responsible knew of Gray Line's precarious financial condition and of its inability to pay for the stock.[13]
 
 
 25
 The issue here is not whether a shareholder of Fifth may recover on his own behalf or even on behalf of Fifth, but rather the narrower question whether the evidence supports an enforcement action under 21(e) of the 1934 Act by the SEC. As the Supreme Court noted in a case involving the SEC's enforcement powers under the Investment Advisors Act of 1940, 'it is not necessary in a suit for equitable or prophylactic relief to establish all the elements required in a suit for monetary damages.' SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 193, 84 S.Ct. 275, 283, 11 L.Ed.2d 237 (1963). While this doctrine does not give the SEC unrestricted license to seek injunctions against phantom violations of the acts within its enforcement responsibilities, there is implied a different standard for SEC actions than for private suits seeking damages. In the present case, controlling persons, without full disclosure to the entire board of directors, caused their corporation to sell valuable stock owned by it to another corporation known by the controlling persons to be incapable of paying for the stock. The terms of the sale did not even provide for the retention of a security interest in the stock and none was obtained until after the present suit was instituted. Under all the facts in this case, we believe the District Court was justified in granting the requested injunction on the basis of the Gateway transaction. Cf. Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970); Shell & Love v. Hensley, 430 F.2d 819 (5th Cir. 1970); Schoenbaum v. Firstbrook, supra.
 
 
 26
 Muscat and Cohn argue that there is no evidence to connect them with the sale of the Gateway stock, but we believe the facts described above constitute sufficient evidence to support the District Court's findings in this regard. See Fed.R.Civ.P. 52(a).
 
 
 27
 Finally, Muscat and Cohn contend that the remedies of an injunction and the appointment of a receiver are mutually exclusive, but cite no authority for such proposition. In view of the history of spoliation of Fifth, the District Court was justified in looking beyond the time of the receivership. If circumstances have changed, as Muscat and Cohn claim, so that they are no longer connected in any way with Fifth, their remedy is to apply to the District Court for modification of the injunction.
 
 
 28
 Accordingly, the order of the District Court will be affirmed.
 
 
 29
 Subsequent to argument and the writing of the above opinion, counsel for Muscat has informed this court that Muscat has consented to an injunction by the District Court (without admitting the allegations of the SEC complaint) that will encompass the relief granted by the District Court in this case and accordingly moves to withdraw Muscat's appeal and have it marked withdrawn. Upon these representations, motion will be granted, and the appeal marked 'withdrawn.'
 
 APPENDIX
 
 30
 Following is a summary of the most significant transactions in this case complained of by the SEC as flouting the Investment Company Act of 1940 or the Securities Exchange Act of 1934.
 
 
 31
 1. The loan from Krock to Fifth in 1965: On October 27, 1965, Krock loaned to Fifth $885,944.45 for six months. He was repaid on May 2, 1966, a total of $1,050,281.95, constituting $44,297 interest at ten percent per annum and a 'premium' of $120,040.50.
 
 
 32
 2. Fifth's note for $85,000 to Saxe, Bacon & Bolan: On July 21, 1966, Fifth gave its note to Saxe, Bacon & Bolan for $85,000. Saxe, Bacon & Bolan then discounted the note with Security National Bank after Gray Line guaranteed payment of the note. Saxe, Bacon & Bolan paid $50,000 of the proceeds to Cohn. Cohn, in turn, paid $25,000 each to Muscat and Krock as partial payment of what he owed them for advances they made to him for his purchase of Huffines' stock in Defiance and BSF. This transaction was not approved by Fifth's board of directors, and Fifth received no consideration for the note.
 
 
 33
 3. The loan to Gray Line in 1966: Gray Line owed Hertz Corp. $601,196.26, on a debenture, and pledged 102,202 shares of Fifth's stock as collateral. To avoid foreclosure on the loan (which would cause them to lose control of Fifth), Muscat and Krock offered to loan funds to Gray Line to enable Gray Line to pay Hertz. Because Guaranty Bank and Trust Company of Chicago, a bank controlled in the Defiance Industries pyramid, loaned Gray Line $147,000, Muscat and Krock needed to lend Gray Line only $454,196.26. However, Krock actually received a note from Gray Line for $561,196.26. In order to qualify for a part of the 'premium' to be paid by Gray Line for this loan, Muscat then substituted $175,000 of his money for that already advanced by Krock. Fifth repaid the note for Gray Line on October 20, 1966. For a seven week loan of $454,000, Krock and Muscat received a 'premium' of $107,000. Such premium was not authorized by Gray Line's Board of Directors. By mistake, the entire $107,000 was paid to Krock, but he then paid Muscat $39,000, as Muscat's share of the 'premium'.
 
 
 34
 4. Fifth's $300,000 loan to Saxe, Bacon & Bolan: On November 4, 1966, Saxe, Bacon & Bolan gave Fifth its note payable in ninety days at 5 3/4% Annual interest in exchange for $300,000. Saxe, Bacon & Bolan paid this amount to Cohn who endorsed the check to Muscat. Cohn thereby used these funds to repay a part of his loan from Muscat, made to enable Cohn to purchase Huffines' Defiance and BSF stock. Saxe, Bacon & Bolan never repaid the loan, but treated it instead as an advance and deducted legal fees from it. No interest was ever paid on the note by Saxe, Bacon & Bolan to Fifth.
 
 
 35
 5. Fifth's sale of Gateway stock to Gray Line: Fifth bought 60% Of the stock of Gateway National Bank for $717,200 on December 15, 1966. This stock was resold to Gray Line at cost in January, 1967. No payment has been made for the stock, and not until after the present lawsuit was filed did Fifth obtain a security interest in the stock, although Gray Line was and is an inactive company.
 
 
 36
 6. Fifth's loan to American Steel and Pump: Fifth loaned $1,800,000 to American Steel and Pump (an affiliated company) at eight percent interest on February 28, 1967. This loan has not been self-liquidating as anticipated, but apparently American Steel and Pump has satisfied its obligations when due.
 
 
 37
 7. Krock's $427,500 commitment fee: On March 1, 1967, Krock guaranteed Fifth he would provide up to $3,500,000 to Fifth until April 21st for the purchase of Austin, Nichols stock. Krock in fact loaned nothing, but received a $427,500 'commitment fee.'
 
 
 38
 8. Tele Pro: In the Spring of 1967, Krock, Muscat, and Cohn agreed to lend from personal funds $225,000 to Tele Pro (another affiliated company). Krock, as treasurer of Fifth, used $152,500 of Fifth's money without the knowledge of Cohn or Muscat for his share of this personal loan. Krock eventually repaid $100,000 of the $152,500 to Fifth.
 
 
 39
 See generally the District Court's opinion at 289 F.Supp. 13-26 for a more detailed description of these and other transactions.
 
 
 
 *
 Of the Third Circuit, sitting by designation
 
 
 [1]
 3(a): 'When used in this subchapter, 'investment company' means any issuer which (1) is or holds itself out as being engaged primarily, * * * in the business of investing, reinvesting, or trading in securities';
 
 
 [2]
 Pursuant to the authority granted in 21(e) of the 1934 Act (15 U.S.C. 78u(e)) and 42(e) of the 1940 Act (15 U.S.C. 80a-41(e))
 
 
 [3]
 7(a): 'No investment company organized or otherwise created under the laws of the United States or of a State and having a board of directors, unless registered under Section 80a-8 of this title, shall directly or indirectly--
 (1) offer for sale, sell * * * any security * * *;
 (2) Purchase * * * any security * * *;
 (3) control any investment company which does any of the acts enumerated in paragraphs (1) and (2) of this subsection;
 (4) engage in any business in interstate commerce; or
 (5) control any company which is engaged in any business in interstate commerce.'
 
 
 [4]
 The District Court also found a violation of 17(a) of the Securities Act of 1933, but the SEC has conceded on appeal that such finding is erroneous
 
 
 [5]
 Section III(e) of Judge McLean's order, entered August 12, 1968, permanently enjoined Muscat, Krock, and Cohn from 'in transactions directly or indirectly involving Fifth or any of its subsidiaries directly or indirectly, by the use of the mails or any means or instrumentalities of interstate commerce or of any facility of any national securities exchange, doing any of the following acts, in the offer or sale or in connection with the purchase or sale of any security,
 (1) employing any device, scheme, or artifice to defraud, (2) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or, (3) to engage in acts, practices or a course of business which operates or would operate as a fraud or deceit upon any person.'
 
 
 [6]
 The District Court's order permanently enjoined Muscat, Krock, and Cohn from:
 '(a) directly or indirectly, in the absence of applicable statutory exceptions, while an affiliated person or an affiliated person of an affiliated person of Fifth and while Fifth is registered or required to be registered with the Commission as an investment company under the Investment Company Act of 1940, knowingly doing any of the following or causing or authorizing any other affiliated person of Fifth or any affiliated person of such affiliated person, to do any of the following, as principal: (1) sell any security or other property to, (2) purchase any security or other property from, or (3) borrow money or other property from,
 Fifth or any company controlled by Fifth unless and until the Securities and Exchange Commission has granted an application for an exemption for such transaction pursuant to Section 17(b) of the Investment Company Act, 15 U.S.C. 80a-17(b), or any other applicable statutory provision;
 (b) directly or indirectly, in the absence of applicable statutory exceptions, while an affiliated person or an affiliated person of an affiliated person of Fifth and while Fifth is registered or required to be registered with the Commission as an investment company participating in or effecting, or causing or authorizing any other affiliated person of Fifth or any affiliated person of such affiliated person to participate in or effect, as principal, any transaction in connection with any joint enterprise or other joint arrangement or profit-sharing plan in which Fifth or a company controlled by Fifth is a joint or a joint and several participant with such person or affiliated person in contravention of Rule 17d-1 under the Investment Company Act, 17 C.F.R. 270.17d-1; (c) directly or indirectly, in the absence of applicable statutory exception, while Fifth is a management type investment company within the meaning of the Investment Company Act of 1940, causing or authorizing Fifth to lend money or property to any person, directly or indirectly, who controls or is under common control with Fifth; (d) directly or indirectly, abstracting or converting to their own use or to the use of another, any of the moneys, funds, securities, credits, property or assets of Fifth.'
 
 
 [7]
 1 Loss, Securities Regulation 146 (2d ed. 1961). This theme is developed in greater detail in Note, The Investment Company Act of 1940, 41 Colum.L.Rev. 269, 272-275 (1941), and Comment, The Investment Company Act of 1940, 50 Yale L.J. 440 (1941)
 
 
 [8]
 SEC, Report on the Study of Investment Trusts and Investment Companies, Part One, H.R.Doc. No. 707, 75th Cong., 3rd Sess. (1938). See especially pp. 15-20, 22-29
 
 
 [9]
 SEC, Report on the Study of Investment Trusts and Investment Companies, Part Four, H.R.Doc. No. 246, 77th Cong., 1st Sess. (1941). See the transactions described in the Appendix to this opinion
 
 
 [10]
 Compare Bankers Security Corp., 15 SEC 695, aff'd sub nom. Bankers Security Corp. v. SEC, 146 F.2d 88 (3rd Cir. 1944)
 
 
 [11]
 See SEC Report, Part One, supra, note 7 at 54-56, 83-88
 
 
 [12]
 3(a)(3): 'When used in this subchapter, 'investment company' means any issuer which is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.'
 
 
 [13]
 Cf. Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc)