Wayne L. KIDWELL, Attorney General of the State of Idaho, ex relation of Don V. PENFOLD and Kenneth M. Cooper, suing in the name of the State of Idaho to protect and enforce the rights of the charitable, recreational and educational beneficiaries of Grand Targhee Resort, Inc., Boyd Moulton and Milton Butler, members of the board of directors of Grand Targhee Resort, Inc., suing on behalf of Grand Targhee Resort, Inc., for the benefit of the charitable, recreational and educational beneficiaries of Grand Targhee Resort, Inc., and Cleon Kunz, suing derivatively in the right, on behalf of and for the benefit of Grand Targhee Resort, Inc., Appellants,

v.

Steve M. MEIKLE, Jr., Valley Bank of Rexburg, Idaho, an Idaho Corporation, Sioux Corporation, an Idaho Corporation, Grand Targhee Resort, Inc., an Idaho Non-Profit Cooperative Corporation, Big Valley Corporation, a Wyoming Corporation, William H. Robinson, Darold E. Smoot, Nile L. Boyle, Neal K. Powell, James E. Mitchell, Jr., Gene Sewell,

John C. Commander, John J. Revello, John D. Hansen, Guy R. Hillman, J. Kent Jolley, Leonard S. Meranus, Charles W. Anness, United States of America, United States Department of Agriculture, Farmers Home Administration, United States Department of Agriculture, Forest Service, Targhee National Forest, Earl L. Butz, Secretary of Agriculture, United States Department of Agriculture, Frank Elliott, Administrator of the Farmers Home Administration, United States Department of Agriculture, United States Small Business Administration, Appellees.

Nos. 76–3688, 77–1253.

United States Court of Appeals, Ninth Circuit.

June 1, 1979.

---

Ronald J. Jarman, Pocatello, Idaho, Blaine S. Butler, Los Angeles, Cal., for appellants.

Sidney E. Smith, U. S. Atty., Boise, Idaho, Gordon S. Thatcher, Rexburg, Idaho, Terry L. Crapo, Idaho Falls, Idaho, Warren S. Derbidge, Asst. U. S. Attys., Boise, Idaho, for appellees.

Before VAN DUSEN\*, WRIGHT and GOODWIN, Circuit Judges.

**GOODWIN, Circuit Judge:**

Plaintiffs appeal from a summary judgment for all defendants. The complaint charged violations of the federal securities laws, advanced several pendent and diversity claims, and sought mandamus against federal officials.

## I. FACTS

The relevant facts, gleaned from a lengthy record· and cast in the light most favorable to the plaintiffs, are as follows:

Grand Targhee Resort, Inc. (Targhee) was organized in 1967 as an Idaho nonprofit cooperative membership corporation. Its purpose was to operate for its members a ski resort on lands leased from the United States Forest Service west of the Grand Tetons, near the Idaho border, in Wyoming. Membership shares were purchased for between $100 and $1,000 each. The total cash investment by members came to about $547,000.

Targhee's bylaws provided for no dividends; members hoped to receive the return of their original cash contribution upon dissolution, but there was no guarantee. Any surplus on dissolution was to be donated to nonprofit charitable, recreational, or educational organizations. The primary benefit of the resort to most of its members was to be the expected stimulation of the local economy as Targhee attracted skiers and other vacationers.

A 15-member board of directors was empaneled from among the members. The articles of incorporation required that at least two thirds of the directors be "farmers or rural residents" of five named counties in Idaho or of one county in Wyoming. Two thirds of the members of Targhee also had to be residents of these six counties.

To finance the construction of ski lifts and other facilities, Targhee borrowed $600,000 from the Farmers Home Administration (FHA). This federal agency oversaw the organization and early operation of Targhee to protect the government's loan. Later, the Idaho Investment Board (IIB) purchased Targhee's obligation from the FHA with state funds, and the FHA continued to insure the loan.

Targhee opened during the Christmas season in 1969. After its first season, Targhee hired a consulting firm to examine its operation. The consultants recommended that additional housing be built near the ski hill so that visitors could spend the night at the resort.

Steve Meikle, Jr., a founder and member and the executive vice president of Targhee, was chairman of the IIB and president and part owner of Valley Bank, a local bank in nearby Rexburg, Idaho. Meikle suggested to the board a housing plan that led to the formation of the Sioux Corporation (Sioux).

Unlike Targhee, Sioux was incorporated for profit. Sioux shareholders were 32 Targhee members selected by Meikle and others. Shares in Sioux entitled their owners to preferential occupancy rights in—and an opportunity to profit from—a new lodge to be built at the Targhee resort. Sioux stock was not offered to the public, nor to all members of Targhee. The selection of Sioux shareholders was accomplished without consultation with the Targhee membership or directors. Among those finally chosen for Sioux ownership were Meikle; Kent Jolley, Targhee's attorney; and some members of the Targhee board of directors. Sioux shares were sold to these stockholders at a nominal price, and the 32 shareholders then purchased long-term debentures from Targhee, subordinated to all of Targhee's other creditors, in the total amount of about $50,000.

---

\* The Honorable Francis L. Van Dusen, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

Targhee then borrowed additional sums, in excess of $340,000, from the Small Business Administration (SBA), and built Sioux Lodge at the resort site. Under a complex agreement, Sioux leased the building from Targhee for about 25 years; Sioux agreed to pay the SBA mortgage out of its sublease receipts and shareholder assessments; and Targhee agreed to manage and maintain the lodge for Sioux on a year-round basis. Sioux had a right of first refusal if Targhee decided to sell the lodge. Jolley served as counsel to both Sioux and Targhee throughout the negotiation of the lodge deal.

There was evidence that the management contract, which forced Targhee to remain in operation the year around, was highly unfavorable to Targhee, and that the design of the Sioux units was disadvantageous to Targhee's food and beverage operation. All 32 Sioux living units had kitchen facilities, enabling Sioux occupants to prepare their meals without patronizing the resort restaurant.

Sioux shareholders subleased the 32 units at the lodge from Sioux, the primary lessee, for 25 years each. Under these agreements, the Sioux shareholders enjoyed some preferential occupancy rights, but had to relinquish their apartments to the public for part of the year to raise funds to pay the rent to Targhee, and hence Targhee's mortgage to the SBA. If public rental of the apartment units at the lodge did not satisfy Sioux's obligation to Targhee, Sioux members would be assessed, after the first two years of lodge operation, to amortize the principal on the mortgage.

In the meantime, the FHA advanced Targhee about $140,000 more in loans, and the IIB ultimately agreed to purchase the $340,000 SBA-guaranteed mortgage on the Sioux Lodge in addition to the $600,000 obligation that the FHA had already insured.

The Sioux transaction provoked immediate dissent from members of Targhee who were not invited to participate. Some saw the lodge as an exclusive "condominium" project whose relationship with Targhee was unfair; they also complained that the lodge project was a *fait accompli* before it was revealed to them. The rift within Targhee gradually widened. One of the most vocal anti-Sioux members, Don Penfold, was threatened with expulsion from Targhee. Soon thereafter, Kitchener Head, a Targhee director, sold his interest in Sioux amid charges that its ownership conflicted with his duties to Targhee. In 1971, the Targhee board resolved to merge with Sioux and dissolve the contracts between the two corporations. Sioux, however, refused to merge.

While the merger controversy was heating up, another controversy arose about the management of the resort, which, from the beginning went steadily downhill. Robert Blank, president and general manager of Targhee, was a Sioux shareholder. Blank's management came under fire from a group of Targhee directors who were not Sioux members. After three seasons, by June 28, 1972, Targhee (whose membership now totaled more than 950) was told by its auditor that it was "about out of business". Targhee was in default on past obligations and had no capital with which to fund any expansion.

Different directors and membership factions proposed their own solutions to the financial crisis. One group urged a shakeup in management with stricter control by the board of directors over business policy decisions, plus a one-time assessment of Targhee members to tide the operation over a cash shortage. Others urged more borrowing, from outside sources (if possible), or, more likely, a sale to an outside party with sufficient capital to turn the resort around. Several takeover and financing proposals were examined.

An important factor in these deliberations was the possibility that the federal government might ease its restrictions on condominium development by forest-land permit holders such as Targhee. Meikle told the Targhee board at its July 6, 1972, meeting that it was possible that Congress might lift the Forest Service's moratorium on condominiums early in 1973, but that this relief could not be predicted with cer-

tainty. If the moratorium were lifted, Targhee's worth as a Forest Service permit holder would be greatly enhanced.

In mid-1972, 3 of the 15 members of the Targhee board of directors were shareholders of Sioux: Nile Boyle, vice chairman of the Targhee board; James Mitchell, Jr., vice president of Targhee; and Guy Hillman, a major supplier to Targhee's restaurant. Jolley, Targhee's attorney, had divested himself by this time of his Sioux stock, but he remained attorney for both Sioux and Targhee until sometime between November 1972 and July 1973, when he stopped representing Sioux. Blank, president of Targhee, remained a Sioux shareholder. Meikle had resigned from the Targhee board, but he remained a shareholder in Sioux and frequent consultant to the Targhee board. Valley Bank, of which Meikle was president, extended credit to Targhee after Targhee had incurred several thousands of dollars in overdrafts on its corporate checking account. Darold Smoot and Neal Powell, two other Targhee directors, were among those who agreed to become personally liable for credit extended to the resort by Valley Bank.

Around November 1, 1972, William Robinson, an Ohio businessman, met with Meikle and Jolley; Meikle then introduced Robinson to the Targhee board as a person interested in investing in the ski resort. Over the next few weeks, Robinson and his lawyers, Leonard Meranus and Charles Anness, discussed the resort with the Targhee board and management, federal officials, and others. Robinson indicated to the Targhee board that he wished to buy control of the corporation's assets, but only if its cur-

rent members, and other residents of Teton Valley, supported him. Meikle told the board at its November 10, 1972, meeting that the Robinson group had made a thorough investigation into the value of Targhee, and that the members' net equity was $250,293 in book value, $982,232 in replacement value, and $1,197,836 in market value.

It was originally understood by the board that a vote of Targhee's membership would have to be taken before any sale of its assets or major refinancing would take place. On November 10, 1972, however, Jolley read to the Targhee board Idaho Code § 30–145(2), which provides that if a corporation is unable to meet its liabilities then matured, shareholder approval of the sale of all its assets is not required.[1] Under this section of the code, the assets of such a corporation may be sold by action of the board alone.

On November 22, 1972, Robinson sent to Targhee's board of directors a letter of intent to purchase its assets. In the letter, Robinson said he would form a new Wyoming corporation, Big Valley, which would purchase Targhee's assets and assume its liabilities, including its contracts with Sioux, in exchange for a minority interest in Big Valley's stock. The Big Valley stock would not be transferred to Targhee or its members outright; rather, it would be placed in escrow for a substantial period to cover any undisclosed liabilities of Targhee.

On November 27, 1972, the Targhee board voted by more than two to one to sign this letter and call a Targhee membership meeting. The board ruled that it qualified under Idaho Code § 30–145(2) for a

---

1. Idaho Code § 30–145 provides:

 "1. A voluntary sale, lease or exchange of all the assets of a corporation may be authorized by it upon such terms and conditions as it deems expedient, including an exchange for shares in another corporation, domestic or foreign.

 "2. If the corporation is able to meet its liabilities then matured, such authorization shall be given at a meeting of shareholders, duly called for that purpose, and by such vote of the shareholders as may be provided for in the articles of incorporation or, if there be no such specific provisions, then by the

vote of the holders of two thirds (⅔) of the voting power of all shareholders. If the corporation be unable to meet its liabilities matured, such authorization may be given by the vote of the board of directors.

 "3. This section shall not be construed to authorize a conveyance or exchange of assets in fraud of corporate creditors or of minority shareholders or shareholders without voting rights, or in violation of the Bulk Sales Law."
The articles of incorporation of Targhee contained no provision for a vote by members authorizing a voluntary sale, lease, or exchange of all its assets.

sale of its assets without a membership vote, but it decided nonetheless to submit Robinson's proposal to an advisory vote. Among the directors voting at the November 27 meeting were Boyle, Mitchell, and Hillman, all of whom were shareholders of Sioux, and Smoot and Powell, who guaranteed Targhee's liabilities to Valley Bank. Jolley, who served as Targhee's attorney at this meeting, was also Sioux's attorney at this time.

Shortly after the directors' meeting, a notice of the upcoming Targhee membership meeting was drafted by Jolley, and sent to Targhee's members. Unlike the usual procedure, in which such notices were signed by the board chairman, this notice was signed and approved for transmittal by Boyle, board vice chairman and a Sioux shareholder. (Boyd Moulton, the chairman, was not a Sioux shareholder, and opposed the sale.) The notice's description of the agenda for the meeting included these entries:

"1. Report on the present financial condition of Grand Targhee.

"2. Make full disclosure of details of William H. Robinson offer to purchase and have members vote either in favor of or against ratifying the resolution of the Board of Directors favoring the purchase of the controlling interest by Mr. Robinson. (Counsel for Grand Targhee has advised the Board of Directors that in view of the fact that Grand Targhee is unable to pay its liabilities now matured, the Board has the authority to proceed with the sale; however, it was determined by the Board that as a matter of fairness to the members, each of you should be fully informed at the meeting as to the purchase proposal, and then afforded the opportunity to vote in favor of or against the proposal.) A brief outline of Mr. Robinson's proposal is as follows:

"(a) A new corporation would be established and all assets of Grand Targhee would be transferred to the new corporation.

"(b) Mr. Robinson would initially pay $325,000.00 for 66⅔% of the stock of the new corporation, and would receive an option to invest up to an additional $325,-000.00, which would increase his ownership to 80% of the outstanding common stock of the new corporation, or proportionately less if the additional investment were less.

"(c) Secure a capital improvement loan in the amount of $1,000,000.00.

"(d) The above funds would be used to pay all of Grand Targhee's liabilities now matured, and to construct two new chair lifts, extension of the lodge and dining room, summit house and restaurant, all-season swimming pool, outdoor lighting, service garage and shop, and additional living accommodations for approximately 240 beds.

"The letter of intent which sets forth Mr. Robinson's purchase proposal in full can be examined by any member of Grand Targhee prior to the meeting by contacting any director, Bob Blank at the resort, or Kent Jolley at his office in Rexburg.

"3. Review and discuss the alternative of assessing existing members for an amount sufficient to meet the liabilities now matured.

"4. Review a proposal made by Alpine Meadows of Tahoe, Inc. (a California corporation with a ski resort located on the North Shore of Lake Tahoe) to merge Grand Targhee with its company. This proposal would give Grand Targhee members a 10% ownership in both resorts. A detailed review of this proposal will be presented at the meeting, also."

There is evidence that the Targhee membership address list was outdated, and that notices sent to many members scattered throughout the United States were returned, undelivered.

On December 13, 1972, the Targhee membership meeting was held. Fewer than half the members were represented, either in person or by proxy. Among those present at this session were four of the five named plaintiffs in this case: Penfold and Kenneth Cooper, non-Sioux members of Targhee; Moulton, chairman of the board of directors

and non-Sioux member of Targhee; and Milton Butler, another non-Sioux member and director of Targhee. Also at the meeting was Blaine Butler, brother of Milton Butler and plaintiffs' attorney in this suit. (Cleon Kunz, the fifth-named plaintiff, is a resident of California and he did not attend.) During the meeting, which was nearly three and a half hours long and sometimes boisterous, Blaine Butler spoke on behalf of the directors who opposed the Robinson sale. The minutes of the meeting show:

"[Blaine] Butler outlined various questions concerning the proposal, and urged that all members be given the complete information of this proposal as a basis for their decision. He further stated that there has been a dereliction of duty on the part of the management and of the board of directors. He urged that the board change managers immediately, to consider other proposals in addition to the one offered by Mr. Robinson, and to plan for other contingencies with full information available to all members."

After Butler spoke, the members discussed the Robinson-Big Valley offer further. Penfold then briefly presented a proposal by a Utah medical group to bid on a purchase of 51 percent of Targhee. The possibility of assessing Targhee members was also explored. Cooper then offered to buy 80 percent of Targhee for $650,000, and give members the option to buy it back from him after two years.

The evidence is in conflict whether the Targhee members at the meeting were informed, clearly or in any detail, that: (a) certain Targhee directors owned shares in Sioux; (b) Jolley had been, and may still have been, Sioux's counsel; or (c) Targhee's directors had become personally liable for the corporation's debts to Valley Bank.[2] Drawing all inferences in favor of the plaintiffs, however, as we must on summary judgment, there was no disclosure of these facts to the fewer than half of Tar-

ghee's members who were at the meeting. Furthermore, it is clear that the notice of the meeting did not reveal these facts. Indeed, the notice is even ambiguous as to whether the directors would pay any attention to the outcome of the vote of the membership.

After about 90 minutes' conversation, the advisory vote of the members was taken. The outcome was 306 for the sale to Robinson and 161 against. Had the directors been required to submit the sale to the membership for a vote pursuant to the statute, the sale would have been defeated by this vote, for, by statute, the minimum vote in favor is two thirds of the entire voting power of the corporation. Idaho Code § 30–145(2). Only about 65 percent of the members *present* voted in favor of the Robinson sale, and fewer than half the members were present. Thus, all told, less than one third of the voting power of Targhee voted for the sale. But because the Targhee directors believed that Targhee was unable to meet its liabilities then matured, they felt that they were exempt by Idaho Code § 30–145(2) from the membership-vote requirement. No further advisory (or other) membership votes were ever taken on this or any other takeover or refinancing plans.

At the December 21, 1972, Targhee board meeting, Milton Butler, a relatively new director, objected on several grounds to the conduct of the December 13 members' meeting. His statement to the board included the following:

"I believe the special notice to members was materially deficient as a proxy soliciting statement in many ways, including the following:

"1. Robinson's letter of intent was not forwarded to members,

"2. The conflict of interest of directors Hillman, Boyle and Mitchell was not disclosed.

"3. The director's [*sic*] refusal to assess was not stated.

---

2. In light of our holding that any disclosure at the Targhee meeting was inadequate in any event due to the incomplete notice and poor attendance, these issues of fact are not material.

"4. The director's [*sic*] refusal to change management was not stated.

"5. The material contingencies in the Robinson proposal were not described.

* * * * * *

"7. There was no disclosure that the minority stock would be held in escrow for a substantial period of time subject to various contingencies.

"8. It was not stated that the members vote would be advisory only; that it had no legal effect; and that the majority of the board had determined to proceed with the sale regardless of how the vote was tallied.

"9. There was no indication of the rights, if any, of dissenting members.

"10. There was no indication of the potential values to be realized if the Forest Service changes its position and allows the operator to develop condominiums at the resort site."

Despite Butler's objections, the Targhee board appointed a committee of directors to negotiate the final details of the transaction with Robinson and Big Valley. Leading this committee was John Hansen, an attorney who had served as a Targhee director since the previous July. Prior to his appointment as liaison with the Robinson group, Hansen had held no interest in Sioux.

On January 24, 1973, the Targhee board agreed to sign a detailed agreement of reorganization with Big Valley. The vote was ten to four, with Sioux shareholders Hillman, Mitchell, and Boyle, and Targhee guarantors Smoot and Powell among those voting in favor. A motion to submit the sale to another vote of Targhee members was rejected by an identical vote.

Shortly thereafter, in February or March of 1973, Hansen bought half of Hillman's share in Sioux. It was clear by this time that, in order for Big Valley to complete its desired deal with Targhee, it would have to assume contract responsibility to Sioux on terms acceptable to Sioux. Jolley had told Meranus this in a letter of January 26, 1973. On February 1, 1973, Meranus wrote Jolley:

"We agree that the Sioux Lodge management agreement should be rewritten and I have already discussed with you [Jolley] the principles upon which the new arrangement should be based." And on January 18, 1973, Sioux had contacted Targhee and noted that the two would probably need to clarify and perhaps revise their agreement in light of the takeover plan. The Targhee board had voted to consider the matter and appointed Smoot as negotiator with Sioux.

In early February, 1973, five Targhee members, including Penfold, brought an action in an Idaho state court to enjoin any sale to Big Valley on the grounds that no statutory membership vote had been taken and that the sale was a fraud on Targhee's members. This litigation prompted Big Valley to announce on February 17, 1973, that it would terminate negotiations with Targhee because time was of the essence in salvaging the resort operation, and the delay caused by litigation would render Targhee worthless to the Robinson group. The Targhee board continued considering alternate sale and financing proposals, while the corporation's fiscal condition continued to worsen.

On March 22, 1973, another meeting of the Targhee board was held, and after a lengthy long-distance telephone call from Hansen and other directors to Robinson in Ohio, the plan to sell the assets was again revived. Hansen returned from the telephone and told the rest of the board that he had discussed a revised contract with Robinson. The minutes then show:

"John Hansen further stated concerning the Robinson proposal that there should be protection for the Sioux Lodge members, and the present form is thought to do this. There is the possibility of Robinson purchasing the Sioux Lodge."

A few minutes later, Hansen declared that he was, according to the minutes, "pushing the sale to Mr. Robinson". The board then voted eight to four to sign a revised agreement with Robinson. Among those voting for the signing were Hansen and Mitchell, Sioux shareholders, and Smoot and Powell,

who had guaranteed Targhee notes. Hillman and Boyle, both Sioux shareholders, were absent.

On June 13, 1973, Hillman resigned from the Targhee board. At the annual meeting of Targhee members on June 28, 1973, four directors were elected; one of the new directors was John Revello, who had become both a Targhee member and a Sioux shareholder in November 1970. Until shortly before his election to the Targhee board, Revello was a director and officer of Sioux. His presence on the Targhee board, along with Hansen, Mitchell, and Boyle, meant that 4 of the 15 directors of Targhee had ownership interests in Sioux after June 28, 1973.

Meanwhile, on June 26, 1973, the five plaintiffs in the state-court proceeding voluntarily defaulted and permitted a judgment to be entered dismissing their suit. Minutes of the Targhee board meeting of July 6, 1973, show that Jolley said the plaintiffs dismissed the case because "there was no longer a sale to Mr. Robinson." But Jolley also explained to the board that on the day following that dismissal, Targhee filed another state-court action of its own against these five members, in which it sought a declaration that Targhee could sell its assets without a membership vote. On July 6, 1973, a declaratory judgment to this effect was entered on the five defendants' default.

Also at the July 6 meeting, the Targhee board considered a written offer from two individuals to purchase Targhee in exchange for debentures, as well as a verbal proposal by Cooper that the resort be placed on an open market for bids. Hansen, Mitchell, and Powell urged the board to accept Robinson's new proposal instead. Hansen said he believed that "if the board does not act on Mr. Robinson's proposal now that this offer will be lost." Hansen then moved that the chairman be authorized to extend to July 31 the deadline Targhee had given for the closing of the sale. Powell seconded the motion, and discussion followed. The motion passed, eight to six; among those voting in favor were Hansen, Boyle, Mitchell, Revello, Powell, and Smoot.

At the next meeting of the Targhee board, on July 30, 1973, Hansen introduced representatives from Big Valley, who presented a modified proposal. In response to questions, Meranus revealed that arrangements with Sioux had not yet been worked out, and that it might take an additional 30 days to negotiate a new agreement concerning the lodge. Smoot also explained that the new Sioux management contract was not yet complete. He said a new agreement concerning Sioux had been "developed and held in abeyance pending sale to Big Valley." The directors then voted eight to five to extend the closing date to August 31, 1973. By August 30, however, closing was still impossible, and so an extension to September 15, 1973, passed by an identical vote.

Sioux held a shareholders' meeting September 10, 1973, to hear the Robinson group's proposal to buy Sioux. That meeting culminated in acceptance, by the vote of more than two thirds of Sioux's shareholders, of Big Valley's offer. According to the plaintiffs here, the agreement ultimately included payment by Big Valley of $30,000 for the 32 Sioux shares, and a release of the Sioux shareholders from current and future liability on the subleases. The subordinated Targhee debentures that the Sioux faction had bought were redeemed; former Sioux shareholders would continue to have preferential occupancy rights, and rights of first refusal should Big Valley sell the lodge units (which it would be buying from Targhee).

The next meeting of the Targhee board was on September 27, 1973. Again the board heard from representatives of Big Valley, and of other prospective purchasers of the resort. After discussion, Powell moved to extend the closing date with Big Valley to October 10, 1973. The motion then passed by a vote of eight to seven. Those voting for it were Hansen, Mitchell, Revello, Boyle, Smoot, Powell, Gene Sewell, and John Commander.

According to the plaintiffs, the Targhee board was illegally constituted at the time

of this vote, and for a substantial prior period, because fewer than half the members were "farmers or rural residents" of the six-county area from which Targhee's articles of incorporation required that two thirds of the directors come. According to plaintiffs' evidence, none of the eight directors who voted for the sale on September 27 were "farmers or rural residents" of these counties.

No further votes were taken. The closing was held on October 3, 1973. Big Valley, with a capitalization of $650,000, put 20 percent of its stock in escrow for Targhee, assumed Targhee's assets and liabilities, and promised to borrow funds to make capital improvements at the resort.

In 1974, the Robinson group asserted claims of nearly $100,000 against Targhee's share of Big Valley, based on alleged undisclosed liabilities. While these claims were in arbitration, this suit was filed.

## II. PROCEEDINGS BELOW

Plaintiffs' amended complaint contains 17 counts. The first seven counts list three sets of plaintiffs:

—Penfold and Cooper, members of Targhee and citizens of Idaho, seek to sue as "relators" on behalf, and over the objection, of the Idaho attorney general. According to Penfold and Cooper, the attorney general has a duty to join in the federal and state law actions because Targhee held its assets in trust for the charitable, recreational, and educational benefit of the people of Idaho. This trust, they contend, arises out of the clause in Targhee's articles of incorporation which directs that upon Targhee's dissolution, the excess value of its assets over its original $547,000 capital shall be dedicated to charitable, recreational, or educational organizations.

—Moulton and Butler, directors of Targhee and citizens of Idaho, seek to sue "on behalf of [Targhee] for the benefit of the charitable, recreational and educational beneficiaries of [Targhee]."

—Kunz, a member of Targhee and citizen of California, brings a standard shareholder derivative suit.

Counts 1 through 6 are against Hansen, Boyle, Mitchell, Revello, Smoot, Powell, Sewell, Commander, Jolley, Hillman, Sioux, Meikle, Valley Bank, Big Valley, Robinson, Meranus and Anness. Count 1 alleges securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated thereunder (17 CFR § 240.10b–5 (1978)). Counts 2 through 5, based on pendent jurisdiction, allege violations of the Idaho and Wyoming securities laws, common law fraud and breach of trust. In these counts, plaintiffs seek $3 million in compensatory damages, and $1 million in punitive damages. Count 6 prays in addition for the return of Targhee's assets from Big Valley.

Count 7 lists as defendants Hansen, Boyle, Mitchell, Revello, Smoot, Powell, Sewell, and Commander. It alleges violations of the Securities Exchange Act, and seeks two injunctions: one against the holding of any more Targhee membership meetings prior to federal securities registration and disclosure, and another against Hansen, Boyle, Mitchell, or Revello's voting on the Targhee board on any matters concerning Sioux or Big Valley.

Counts 8 through 13 list as plaintiff only Kunz suing derivatively; diversity and pendent jurisdiction are alleged. Count 8 is a malpractice suit against Jolley, seeking $500,000 damages. Count 9 is a malpractice suit against Hansen, seeking $250,000 damages. Counts 10, 11, and 12 are against Sioux, Valley Bank, and Meikle, respectively, charging wrongful abuse of control over Targhee and seeking an accounting and profits. Count 13 charges Hillman with a breach of trust in the dealings between Targhee and his grocery business.

Counts 14 through 16 list the same plaintiffs as Counts 1 through 7, and the following defendants: the United States, the Forest Service, the SBA, the administrator of the FHA, the Secretary of Agriculture, the State of Idaho, the IIB, Valley Bank, and

Meikle.[3] Jurisdiction is claimed under 28 U.S.C. § 1346(a). Count 14 seeks a declaration that these defendants were actually joint venturers with Targhee, and therefore that their claims to the amounts they loaned to Targhee should be subordinated to those of Targhee's members. Count 15 alleges that the defendants breached an implied contract to invest more capital in Targhee, and asks the court to compel the defendants to make a payment of $1,650,000 new "capital". Count 16 alleges breach of another implied agreement by these defendants, to act only in the best interests of all of Targhee's members. This count seeks $3 million damages.

The final count, as amended with Kunz as derivative plaintiff, is against the Forest Service, SBA, Secretary of Agriculture and administrator of the FHA. The count seeks mandamus relief under 28 U.S.C. §§ 1331 and 1361, asking that the court, if it should order the return of assets to Targhee, also compel the government defendants to reinstate the loans they had made, and the permits they had issued, to Targhee.

Plaintiffs also seek attorneys' fees from the defendants and Targhee.

Counts 14, 15, and 16 were dismissed on defendants' motion. The district court granted summary judgment on all counts in favor of Big Valley, Robinson, Meranus, Anness, Meikle, Valley Bank, · Targhee, Smoot, Boyle, Powell, Mitchell, Sewell, Commander, Revello, Hansen, Hillman, and Jolley. The court held that Penfold, Cooper, Moulton, and Butler and the beneficiaries they purport to represent are not purchasers or sellers of securities, and therefore may not sue under Section 10(b) and Rule 10b–5 by virtue of the holding in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The court also dismissed the attorney general as plaintiff.

As to Kunz's derivative action under Rule 10b–5, the court held that there was insufficient evidence of fraud against Big Valley,

Robinson, Meranus, and Anness. The court held that the claims against Targhee, its directors, Jolley, Hillman, Meikle, and Valley Bank were in essence claims for corporate mismanagement and waste, which should be reserved for state courts; and that the disclosure of material facts to the Targhee board precluded any finding of fraud or deception.

Upon dismissing the federal securities law aspects of the action against these defendants, the trial court dismissed the remaining claims against them on the ground that they were pendent. The court also dismissed Count 17, on the grounds that it was unripe and without merit; and it granted summary judgment to Sioux, the last remaining defendant in the action, on all issues, for lack of specific evidence.

### III. ISSUES ON APPEAL

Plaintiffs do not appeal the judgments of dismissal entered in favor of the United States, the State of Idaho, and the IIB. They present the following issues for our determination: whether Penfold, Cooper, Moulton, and Butler have standing and the right to sue over the express objection of the Idaho attorney general; whether Big Valley, Robinson, Meranus, Anness, Meikle, Valley Bank, Sioux, Smoot, Powell, Mitchell, Sewell, Commander, Revello, Hansen, Hillman, and Jolley were entitled to summary judgment; whether it was proper to dismiss the mandamus count against the Forest Service, SBA, Secretary of Agriculture, and administrator of the FHA; and whether it was proper to dismiss Counts 8 through 16, which appellants say were pleaded in diversity as well as pendent jurisdiction.

### IV. DISCUSSION

#### A. *Plaintiff Kidwell ex rel. Penfold and Cooper.*

■ The trial court dismissed Penfold and Cooper's action on the ground that they

---

**3.** Plaintiffs sought an amendment to Counts 14 through 17; it is unclear whether leave to amend was granted as to Counts 14 through 16.

This discussion of the complaint summarizes Counts 14 through 16 in their original form. *See* Section IV(H), *infra.*

lacked standing to bring it. The court held that under *Blue Chip Stamps v. Manor Drug Stores, supra,* there could be no Rule 10b–5 action by Penfold, Cooper, the attorney general or the beneficiaries of Targhee since none of them was a purchaser or seller of the Big Valley securities. In addition, the court held that the attorney general had no duty to join in such a suit.

We agree, and in light of the dismissal of Penfold and Cooper's federal securities actions, their pendent state law claims were also properly dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Ayala v. United States,* 550 F.2d 1196 (9th Cir. 1977); *cert. dismissed,* 435 U.S. 982, 98 S.Ct. 50, 54 L.Ed.2d 70 (1978). Furthermore, there is no diversity between Penfold and Cooper on the plaintiff side and all the defendants. Diversity jurisdiction therefore fails. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

Even if federal question, pendent or diversity jurisdiction were present, however, Penfold and Cooper could bring no action on behalf of the Targhee beneficiaries in any event. Fed.R.Civ.P. 17(a) permits suits by persons other than those whose legal rights are at issue only if the plaintiff is "[a]n executor, administrator, guardian,

bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute." Parties such as Penfold and Cooper are not included in this listing. And since their action is not to enforce their own legal rights, but rather those of "the public", Penfold and Cooper are not the real parties in interest. Instead, they attempt to bring an unwilling attorney general into the action as the party plaintiff, calling themselves "relators". It won't work. No provision of the Federal Rules of Civil Procedure sanctions such a technique. Historically, relators have been parties in petitions for writs such as habeas corpus, quo warranto, mandamus and prohibition, or in suits in which relator status is specifically authorized by statute.[4] Traditionally, a private party can sue as a relator in the name of the attorney general only if that official expressly or impliedly consents. *Brown v. Memorial National Home Foundation,* 162 Cal.App.2d 513, 538–39, 329 P.2d 118, 133–34 (1958). Such consent is lacking here.

In sum, plaintiffs have not cited, nor can we find, any precedent for permitting relators in a federal action in which the real party in interest is unwilling to give consent to it.[5] Therefore, we hold that Penfold

---

4. *E. g., United States v. White County Bridge Commission,* 275 F.2d 529, 535 (7th Cir.), *cert. denied,* 364 U.S. 818, 81 S.Ct. 50, 5 L.Ed.2d 48 (1960) (federal statute authorizing direct action by United States to recover misappropriated funds does not authorize relator action by United States naming local agency as plaintiff); *State ex rel. Beko v. Reynolds Electrical & Engineering Co.,* 272 F.Supp. 942, 946 (D.Nev. 1967) (statute authorizing county district attorneys to sue on state's behalf to collect delinquent property taxes makes state real party in interest).

5. To some extent, Penfold and Cooper's action resembles an attempt to join the attorney general as an involuntary plaintiff under Fed.R. Civ.P. 19(a). That Rule provides that a necessary (indispensable) party may be joined as an involuntary plaintiff "[i]f he should join as a plaintiff but refuses to do so * * *." The rule limits the use of the involuntary plaintiff device to "a proper case".

Assuming arguendo that the state attorney general could be an indispensable party in this case (that is, assuming that his absence could

"as a practical matter impair or impede his ability to protect [the alleged beneficiaries'] interest", *see* Rule 19(a)), this is nonetheless not a proper case for the involuntary plaintiff procedure. That technique has generally been limited to those cases in which patent or copyright licensees seek to sue alleged infringers. Since a suit for infringement could only be instituted by the holder of legal title to a patent, the Supreme Court held in *Independent Wireless Telegraph Co. v. Radio Corp. of America,* 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357 (1926), that a licensee could join an unwilling patentee as plaintiff, even though that patentee was outside the jurisdiction of the trial court. The Court relied on the equitable obligation of the patentee to the licensee, implied in the license contract, to allow its name to be used as plaintiff. 269 U.S. at 469, 46 S.Ct. 166.

The involuntary plaintiff rule has been sharply restricted, and this court's decision in *Caprio v. Wilson,* 513 F.2d 837 (9th Cir. 1975) is a good example. There, this court found that a California congressman had abused his franking privilege for the delivery of campaign litera-

and Cooper's action, no matter what the underlying claim or basis of jurisdiction, was impermissible under the Federal Rules of Civil Procedure.

### B. Plaintiffs Moulton and Butler.

■■■ Moulton and Butler, directors of Targhee, purport to sue on the corporation's behalf "for the benefit of" its residual charitable, recreational and educational beneficiaries. In the sense that they sue "on behalf of" the corporation, their action appears to be a directors' derivative suit, something not contemplated by the procedural rules of the federal courts. Furthermore, there has been no request to certify the beneficiaries as a class (in fact, plaintiffs insist that this is not a class action), nor do Moulton and Butler claim to be members of the group of beneficiaries whom they seek to represent.

As we noted with respect to Penfold and Cooper's action, these named plaintiffs and Targhee's contingent beneficiaries were not purchasers or sellers of securities and thus lack standing under Section 10(b) and Rule 10b–5 by virtue of *Blue Chip Stamps v. Manor Drug Stores, supra.* And their pendent state-law claims were also properly dismissed, along with their diversity claims. *See* Section IV(A), *supra.* But as with Penfold and Cooper, there is a more fundamental reason why Moulton and Butler's entire case was properly dismissed.

Their complaint states that the Attorney General does not have exclusive power to enforce the rights of the beneficiaries of Targhee, adding:

"There is no rule, policy or sound reason against supplementing the Attorney General's power of enforcement * * * by allowing other persons with special interest to sue in behalf of Targhee's charitable, recreational and educational beneficiaries."

Be that as it may, there appears to be no rule or reason in either state or federal law *for* supplementing the attorney general's power in the way these directors contemplate. There are several means by which these beneficiaries' interests might possibly be protected, including (1) a class action; (2) a suit by the corporation, either directly or derivatively by members; and (3) a suit by a willing attorney general. To supplement these actions by creating a directors' derivative action would be an unwarranted expansion of the Federal Rules. Thus, Moulton and Butler's claim was properly dismissed, but again, the proper reason is more fundamental than their failure to qualify as "purchasers" under Rule 10b–5. No matter what the source of the right asserted, this court is powerless to sanction the creation of this new and unprecedented kind of lawsuit.

### C. Mandamus Count.

The plaintiffs also seek mandamus against several federal officials and agencies, charging that they participated in the alleged Rule 10b–5 violation. Should a violation and federal complicity be found, plaintiffs contend, these defendants should be ordered to reinstate federal permits and loans issued to Targhee.

■■■ The trial court found the mandamus claims to be without merit and nonjus-

---

ture. But we rejected the defeated candidate-plaintiff's motion to join the Postal Service as an involuntary plaintiff. We explained that in *Independent Wireless,* the relation of the patentee to the licensee was "akin to a trust relationship", and the patentee owed the licensee a specific duty to allow its name to be used in the action for infringement. No such duty existed between the Postal Service and Wilson's disgruntled challenger. 513 F.2d at 839–40.

Penfold and Cooper closely resemble the losing candidate in *Caprio v. Wilson,* in that the attorney general owes them no contract duty to have his name used in their action. If any duty

exists at all, it is only the general duty of the attorney general to protect the interests of the people of the state. And that duty is much closer to the general duties of the Postal Service in *Caprio* than it is "akin to a trust relationship" between two contracting parties in *Independent Wireless.*

Thus, if Penfold and Cooper sought to join the attorney general as an involuntary plaintiff, their action would have to be dismissed. That they attempted an "end run" by the use of the "relator" label should not change this result.

Penfold and Cooper do not assert that theirs is a class action.

ticiable. Because the justiciability holding was jurisdictional, the ruling on the merits was dicta; in any event, the court was correct on the jurisdiction question. The action against the federal defendants is premature. It is based on contingencies. It presents no case or controversy, and the action is not ripe for adjudication.

A long line of cases holds that the federal courts may not decide suits in which the adversity of the parties rests on the happening of some event whose future occurrence is in doubt. This rule effectuates several sound policies. It conserves judicial energies for litigants who have a real need for official dispute resolution; it ensures a concrete and adverse presentation of factual and legal issues to protect against ill-advised adjudication; and it restrains the judiciary from injecting itself into the affairs of the legislative and executive branches.

For example, in *Boyle v. Landry*, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971), the Court refused to decide a suit seeking an injunction against the enforcement of a criminal statute that was never used, and whose use was never threatened, against the plaintiffs. Similarly, in *Roe v. Wade,* 410 U.S. 113, 128–29, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court declined to hear the challenge of a married couple to an antiabortion law, on the ground that the wife was not pregnant. The possibility that she might become pregnant in the future, the Court said, rendered the likelihood of the couple's being injured too speculative. *See also Communist Party of the United States v. Subversive Activities Control Board,* 367 U.S. 1, 79–81, 107–08, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961) (future effect of act proscribing political party activities too speculative for adjudication; constitutional claim also premature until attorney general took action to deny alleged Fifth Amendment rights).

*Nixon v. Administrator of General Services,* 433 U.S 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), further illustrates the ripeness doctrine. There, the former President challenged a federal statute that called for impounding presidential documents and tapes.

Nixon also challenged a number of proposed regulations that had been drawn up by the Administrator of General Services for the proposed public dissemination of the materials, which were in the Administrator's custody. The Court refused to review the validity ·of the regulations, since they had not yet taken effect. Like the trial court, the Supreme Court restricted its inquiry to the injury to Nixon's constitutional rights already caused by the taking of the materials, but not that which might be caused by their future release. 433 U.S. at 436–39.

The application of these principles to this case makes the result self-evident. The private plaintiffs admit that due to governmental immunity they have no cause of action against the federal defendants unless (1) the private defendants are held liable, and (2) the court exercises equitable power and orders the sale rescinded. If the court takes these two steps, and if the federal defendants then refuse to reinstate the loans and permits previously issued to Targhee, *then,* the plaintiffs argue, mandamus to those officials would be required. The ripeness problem is evident, and fatal. The federal defendants might not refuse to reinstate Targhee; even if they do refuse, there is still the double contingency within the action itself—a finding of liability and a grant of equitable relief. These contingencies preclude the present action for the extraordinary writ. *See Daley v. Matthews,* 536 F.2d 519, 522 (2d Cir. 1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1548, 51 L.Ed.2d 773 (1977) (ripeness doctrine particularly applicable to challenges to agency action); *Webster v. Mesa,* 521 F.2d 442, 444 (9th Cir. 1975) (refusing to hear challenge to election qualification statute on ground that no candidate had ever been disqualified thereunder).

Plaintiffs argue that under a balancing test, the harm caused by delay would outweigh the harm in proceeding immediately with the mandamus claims, and, thus, those claims are ripe. While there is some authority for the proposition that balancing is proper in determining ripeness (*see* 13 C. Wright, A. Miller & E. Cooper, Federal

Practice & Procedure § 3532 (1975)), the balance of interests in this case tips in favor of permitting a decision on the mandamus question to await the conclusion of the action against the private defendants. If plaintiffs lose their Rule 10b–5 suit, or get only money damages as a remedy, then they admit they will have no cause of action against the federal defendants. And if the plaintiffs succeed, rescission is granted, and the federal officials balk, it will take no unduly great effort to allege and prove defendants' participation in the violative conduct. Indeed, resolving the Rule 10b–5 issues in the case against the private defendants may help pinpoint precisely which aspects, if any, of the federal officials' conduct warrant mandamus. Hence, the amount of time saved by entertaining the mandamus action now would be little or none, and the amount of extra time spent would almost assuredly be great. Even under a balancing test, the mandamus action is not ripe, and was properly dismissed below.

### D. Section 10(b) and Rule 10b–5.

■ With the ineligible plaintiffs dismissed, the suit under Section 10(b) of the Securities Exchange Act and Rule 10b–5 becomes a simple derivative suit brought by Kunz on Targhee's behalf.[6] Targhee was a "purchaser" of Big Valley securities in that it transferred its assets to Big Valley in exchange for its shares. Thus, the purchaser-seller requirement of *Blue Chip Stamps v. Manor Drug Stores, supra,* is met, and Kunz, as a Targhee member, may sue derivatively to redress the harm to Targhee.

An analysis of minority shareholders' rights under Rule 10b–5 should begin with the Supreme Court's decision in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). There, in dismissing a suit by disenchanted minority stockholders under Rule 10b–5, the Court addressed limits of liability under the antifraud provisions of the federal securities laws.

The plaintiffs in *Santa Fe Industries* had been "frozen out" of the corporation in which they had owned shares through a device under Delaware corporation law known as the "short-form merger". Under this procedure, a parent company owning 90 percent or more of a subsidiary corporation's shares could force the minority to sell their shares back to the corporation for cash. Even if motivated by a desire to shortchange minority shareholders, and grossly unfair to that minority, a short-form merger could not be blocked under then-existing state law. The only remedy an unhappy shareholder would have was to have his or her shares appraised by a state court, which would order the majority to

---

6. Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, provides in relevant part:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

 \* \* \* \* \* \*

 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

 Rule 10b–5, 17 CFR § 240.10b–5 (1978), provides:

 "Employment of manipulative and deceptive devices:

 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 "(a) To employ any device, scheme or artifice to defraud,

 "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 "(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

pay the appraised value in exchange for the surrender of the minority stock.[7]

The Court held that when minority shareholders confronted by a short-form merger had at their disposal all material information needed to decide whether to accept the offer or seek appraisal, no challenge could be made to the merger under Rule 10b–5. Stressing that the language and history of the Securities Exchange Act section and the Rule centered on manipulation and deception, the Court held that no cause of action could be brought under the Rule without one of these two elements. 430 U.S. at 471–74, 97 S.Ct. 1292. In *Santa Fe Industries* the shareholders were not deceived, and hence, their suit failed. The Court went on to note that sound policy reasons backed its decision not to turn every breach of state law fiduciary duties that involved securities into a federal securities fraud case. 430 U.S. at 477–80, 97 S.Ct. 1292.

While clearly limiting the applicability of Rule 10b–5, *Santa Fe Industries* has not meant that every breach of fiduciary duties is necessarily immune from invocation of the rule. Indeed, two courts of appeals have held that even where shareholder approval is not required for a corporate act under state law, failure by directors and others to disclose conflicts of interest or unfairness to shareholders regarding the transaction constitutes a violation of the rule.

*Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), is one such case. The court there held that a subsidiary's issuance of stock to its parent corporation on grossly unfair terms violated the rights of the minority shareholders of the subsidiary. The court analyzed the Supreme Court's opinion in *Santa Fe Industries*, and found "deception" in *Goldberg* even though the board of directors of the subsidiary, and not its shareholders, were authorized by state law to adopt the stock issuance plan. Although the subsidiary's directors acted on

their own, and no shareholder vote was required, the court held that the shareholders were deceived because they were lulled into security by an incomplete disclosure.

The shareholders, said the court, were not informed that some of the directors were controlled by the parent corporation with which they were dealing. Nor were the stockholders fully apprised of facts that would have shown how inadequate the consideration for the subsidiary stock was. Since these facts " 'would have assumed actual significance in the deliberations' of reasonable and disinterested directors", the *Goldberg* court said, they were material and should have been revealed to the minority shareholders before the stock was issued. 567 F.2d at 219, *quoting TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The Second Circuit distinguished *Santa Fe Industries* by noting that there the applicable state law provided no remedy whereby disgruntled stockholders might contest the merger. In its case, the Second Circuit explained, New York law would have permitted shareholders to seek injunctive relief to block the stock-issue plan, had they been told of the board's conflicts of interest. *Goldberg v. Meridor*, 567 F.2d at 220.

The Seventh Circuit agrees with this holding. In *Wright v. Heizer Corp.*, 560 F.2d 236 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978), it announced substantially the same rule of law in finding a series of transactions by corporate directors fraudulent under Rule 10b–5. One transaction in the alleged fraud required shareholder approval, and the court had little trouble finding inadequate disclosure in the corporation's methods of obtaining shareholder consents. But it went on to find another violation in a pledge of the corporation's assets to the defendant Heizer Corporation—a transaction in which no shareholder approval was required under applicable (Delaware) law.

---

7. Ironically, the Delaware courts did away with this rule shortly after *Santa Fe Industries* was decided. *Singer v. Magnavox Co.*, 380 A.2d 969 (Del.1977); *Kemp v. Angel*, 381 A.2d 241 (Del.Ch.1977).

Heizer controlled three of the four members of the board who approved the pledge, and the court said that it was insufficient under Rule 10b–5 to disclose just the general terms of the transaction to the shareholders two months after it was completed. The unanimous panel observed:

" * * * Under these circumstances, Heizer was obliged to disclose the material facts concerning the transaction to the independent shareholders prior to its consummation." *Wright v. Heizer Corp.*, 560 F.2d at 249.

■ Thus, contrary to the arguments of the defendants in this case, there is room for Rule 10b–5 liability after *Santa Fe Industries* even when the only deceived parties are shareholders who are not entitled to vote on the transaction in question, and even though there may be a breach of fiduciary duty under state law. Indeed, under the *Goldberg* rationale, it is precisely because there are state-law remedies for the shareholders that a deception can be found. Inadequate disclosures lull into security those shareholders who might bring derivative actions under state law to enjoin the securities transactions if all material facts were revealed.

When this case was decided below, *Santa Fe Industries* had not been decided; at the time of the initial briefing on this appeal, neither *Goldberg v. Meridor, supra,* nor *Wright v. Heizer Corp., supra,* were published. Thus, the record before us sheds little light on the question whether, in state court, an action could have been brought to block the sale of Targhee's assets for Big Valley stock. But the plaintiffs have presented evidence that four Targhee directors were shareholders of Sioux at the time the sale was finally approved; that Big Valley planned at that time to buy both Targhee and Sioux, as the Targhee directors and counsel knew; that no notice of these facts was given to the Targhee members; that Targhee eventually received only a small consideration for its assets; and that the only disclosure of facts to Targhee's members came in an ambiguous no-

tice followed by a disorderly meeting which fewer than half of Targhee's members attended.[8] The plaintiffs also allege that the transaction was grossly unfair because while Targhee sustained a loss, Sioux shareholders reaped a profit on the Big Valley takeover, again with no disclosure to Targhee's members.

■ Under Idaho law, in these circumstances minority members reasonably could have brought a well-pleaded derivative suit to block the sale of Targhee's assets. Counsel for Meikle, Valley Bank, Jolley, and the Targhee directors admits this in his brief, and there is substantial support for, this proposition in state authorities.

■ Under Idaho Code § 30–142, corporate directors are fiduciaries, and may not appropriate corporate assets or opportunities for their own gain. Close scrutiny is given to all corporate actions in which the directors have a financial interest. In *Weatherby v. Weatherby Lumber Co.*, 94 Idaho 504, 492 P.2d 43 (1972), the court held that the managing director-shareholder of a family corporation was liable for purchasing his brother's and sister's stock without telling them that he was negotiating a sale of the corporation that would enhance the value of their holdings. The court found that the controlling brother owed a duty of full disclosure to the less well informed brother and sister.

*Hanny v. Sunnyside Ditch Co.*, 82 Idaho 271, 353 P.2d 406 (1960), held that a director should not have issued to himself shares of stock that the corporation's articles of incorporation required to be offered first pro rata to all existing stockholders. Included in the remedies were rescission of the issuance of the shares, and supervision by the court of the redistribution of the stock.

Equitable relief was also granted for director misconduct in *Knutsen v. Frushour*, 92 Idaho 37, 436 P.2d 521 (1968). There, a director purchased for his own benefit land that the corporation was seeking to purchase. The court ruled that the director

---

**8.** *See* footnote 2, *supra.*

held the land in a constructive trust for the corporation.

Given this line of cases, the Idaho courts almost certainly would have entertained a suit by the shareholders charging a breach of fiduciary duties by the Targhee directors who voted for the sale of assets to Robinson. Granted, there was no requirement of membership approval under Idaho Code § 30–145(2), because the corporation was insolvent, and the members may not have been able to seek appraisal for the same reason under Idaho Code § 30–150. But the shareholders in *Goldberg v. Meridor, supra,* shared substantially the same disabilities. And given the mandate of Idaho Code § 30–142 and the Idaho case law on directors' fiduciary duties, we believe the defendants are correct in admitting that a suit could have been brought in state court to enjoin the sale on grounds of conflict of interest and unfairness.

There may also have been other grounds for a state-court suit blocking the sale. According to plaintiffs, the Targhee board was constituted in violation of its articles of incorporation and bylaws. Moreover, in some jurisdictions, even if properly constituted, a board may not take actions amounting to a corporate merger without a shareholder vote—despite the fact that the form of the transaction may be a sale of assets. *Compare Farris v. Glen Alden Corp.,* 393 Pa. 427, 143 A.2d 25 (1958) (recognizing "de facto merger" doctrine), *with Hariton v. Arco Electronics, Inc.,* 41 Del.Ch. 74, 188 A.2d 123 (Sup.Ct.1963) (holding doctrine inapplicable). These circumstances may also have given rise to a state-court cause of action here.

In any event, it is clear that there was no full and fair disclosure of all material facts to the minority members of Targhee. The four directors' ownership of Sioux was certainly a material fact, for there is "a substantial likelihood that [its] disclosure * * * would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted).[9] Since a reasonable minority shareholder probably would have considered this information important in any decision whether or not to sue to block the sale, full disclosure of these conflicts to all shareholders was required.[10] And as this court has noted in a related area, the mere possibility that an inquisitive shareholder actually present at a meeting could have ascertained these facts does not constitute meaningful disclosure. *Gaynor v. Buckley,* 318 F.2d 432, 435 (9th Cir. 1963).

Furthermore, if other state causes of action were available to enjoin the sale besides the directors' conflicts of interest, then other withheld facts may have been material. We leave a complete listing of material undisclosed facts for the trial court on remand; additional briefing by the parties may be useful for this purpose.

In a nondisclosure case under Rule 10b–5, a finding of materiality creates a presumption of reliance. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *see Mills v. Electric Auto Lite Co.,* 396 U.S. 375, 384–85, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Therefore, the trial court should presume that the minority

**9.** *TSC Industries* was a decision under the federal proxy rules, but its definition of materiality was cited in *Santa Fe Industries,* 430 U.S. at 474 n.14, 97 S.Ct. 1292, and this court has applied a similar standard in Rule 10b–5 cases as well. *See Zweig v. Hearst Corp.,* 594 F.2d 1261 at 1264–67 (9th Cir., 1979); *Lewelling v. First California Co.,* 564 F.2d 1277 (9th Cir. 1977).

**10.** In cases such as this, where the deception is found in nondisclosure affecting shareholders'

decisions whether or not to sue to block a corporate transaction, we believe the proper inquiry on the materiality question is what a reasonable shareholder would have considered significant. To the extent that it differs (by focusing on the expectations of a reasonable director), the Second Circuit's analysis in *Goldberg v. Meridor, supra,* is disapproved. In *Goldberg,* the result could have been the same under our shareholder-focused materiality analysis.

members would have brought suit to block the sale had they known of the material facts that gave rise to a cause of action under state law.

 This does not dispose of the entire element of causation in the Rule 10b–5 suit, however. The mere fact that a minority member of Targhee may have been able to state a claim in a suit under state law to block the sale does not mean that he or she would have been successful. As at least one observer has noted,[11] there is a difference between saying that a state court generally provides equitable relief for the type of injury a reasonable minority shareholder might allege, and saying that a state court would have provided such remedies to particular minority shareholders of a particular corporation over a particular corporate transaction. We believe that in light of the Supreme Court's holding in *Sante Fe Industries, Inc. v. Green, supra,* we are foreclosed from holding that a minority shareholder can recover on the corporation's behalf under Rule 10b–5 simply because his or her state court complaint would have stated a cause of action. Following the Court's discussion there of the primacy of state law in remedying breaches of fiduciary duty, we hold that no relief is available to Kunz here under Rule 10b–5 unless a minority member would have succeeded in getting permanent injunctive relief, or damages in excess of an appraisal remedy, in the state-law action. The question is essentially one of fact, but the federal trial judge should decide any legal issues that would have arisen in the hypothetical state suit as a matter of law in the Rule 10b–5 suit. *Cf. Wellman v. Jellison,* 593 F.2d 876, 878–79 & n.1 (9th Cir. 1979); *Chocktoot v. Smith,* 280 Or. 567, 571 P.2d 1255 (1977) (analyzing duty of judge in attorney malpractice suit to decide legal questions in underlying litigation from which negligence claim arose).

 Of course, on remand, the district court should also recall the scienter requirement under Rule 10b–5. *Ernst &*
*Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Under *Ernst & Ernst,* defendants cannot be held liable for money damage under Rule 10b–5 if their conduct is merely negligent. Thus, the defendants here cannot be held responsible for nondisclosure of facts they did not know, even if they were negligent in not discovering them. Only facts of which defendants were aware, and which, if disclosed to minority members, would have enabled them to bring a successful state-court suit, are relevant.

The final task in the analysis of the claim under Rule 10b–5 is to determine which of the defendants owed the Targhee members a duty to disclose the material facts that went undisclosed.

 In *White v. Abrams,* 495 F.2d 724, 735–36 (9th Cir. 1974), this court declared that five factors are to be considered in determining the scope of a defendant's duties under Rule 10b–5: (1) the relationship of the defendant to the plaintiff; (2) the defendant's access to information, compared to that of the plaintiff; (3) the benefit the defendant derived from the relationship with the plaintiff; (4) the awareness by the defendant of the plaintiff's reliance on him or her; and (5) the defendant's activity in initiating the securities transaction in question. Although *White v. Abrams* has been overruled insofar as it contemplated liability without scienter (*Ernst & Ernst v. Hochfelder, supra*), its approach to the duty question is otherwise good law. *See Zweig v. Hearst Corp.,* 594 F.2d 1261 at 1268–69 n.12 (9th Cir., 1979); *Crocker-Citizens National Bank v. Control Metals Corp.,* 566 F.2d 631, 636 n.2 (9th Cir. 1977).

In *White v. Abrams, supra,* this court gave two extreme examples of degrees of duty under the rule. At one extreme were fiduciaries, who the court said should be held to the highest standards of duty. At the other were strangers whose relationship

---

11. Note, *Suits for Breach of Fiduciary Duty Under Rule 10b–5 After Santa Fe Industries, Inc. v. Green,* 91 Harv.L.Rev. 1874 (1978).

to the plaintiffs was so casual that they owed little duty other than to refrain from intentional misrepresentation. 495 F.2d at 736.

Despite Kunz's conclusional allegations to the contrary, it is clear that Big Valley, Robinson, Meranus, and Anness owed no duty of disclosure to Targhee under this approach. Targhee should be presumed to have known as much about its own assets and affairs as this group of defendants did. If Targhee underestimated the value of its own assets, or if its members misjudged the candor of its directors, counsel, and officers, the Robinson group, as an arm's-length dealer, cannot be held liable for causing these miscalculations.

*Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), is a leading case holding that arm's-length purchasers of corporate assets or securities are not liable under Rule 10b–5 for any inadequacy of consideration. In *Schoenbaum,* a corporation called Banff failed to disclose that it had discovered oil and that its stock was about to increase handsomely in value. While the discovery was still secret, a firm named Paribas purchased Banff shares at a price well below its true worth. The Second Circuit held, inter alia, that Paribas was not liable under Rule 10b–5 since there was no reason to believe that Paribas had any information not available to Banff. Additionally, the court found no reason to believe that Paribas could improperly influence the judgment of the Banff directors. 405 F.2d at 219.

In this case, Robinson and his group of defendants are directly analogous to Paribas in *Schoenbaum v. Firstbrook,* and therefore they cannot be held liable under Rule 10b–5. Had plaintiffs produced any evidence that the Robinson group actively exerted unfair pressure on the Targhee directors, or that these defendants purposely overpaid the Sioux shareholders in order to win the necessary votes on the Targhee board, then *Schoenbaum* might be distinguishable. On the record before us, however, it is not.

The case against Meikle and Valley Bank is somewhat more substantial, but we hold that it, too, fails to prove a duty of disclosure to Targhee. Meikle was no stranger to Targhee. He was its founder and principal promoter, as well as the designer of Sioux and a major financier of the Targhee operations. The minutes of Targhee's board meetings show that he was called upon to serve as a special consultant to the corporation even after his formal departure from the board. And taking the evidence in the light most favorable to Kunz, Meikle introduced Robinson to the board and urged the board members to approve the sale to Big Valley.

Nonetheless, we do not believe his relationship to Targhee was such that he or Valley Bank owed a duty of disclosure to Targhee's minority shareholders under *White v. Abrams, supra.* Meikle had no vote on the Targhee board, received no compensation for his advice to Targhee, and was not in regular attendance at board meetings through the period in which the sale to Big Valley was being considered. Kunz asks us to infer from Meikle's position as a leading banker in the area and as a board member of government financing agencies that he used undue influence on the Targhee directors, and enlisted the help of the FHA and IIB to force the sale to Big Valley. But plaintiff has produced no evidence to prove this allegation. On the record before us, Meikle and Valley Bank did no more than any worried creditor might legitimately do in the face of the impending demise of a large debtor.

As a shareholder of Sioux, Meikle stood to gain from an advantageous sale of that entity to Big Valley. As a founder of Sioux, he was responsible for creating that possibility of profit. But the Rule 10b–5 claim here does not focus on those early transactions; the fraud alleged was "in connection with" the exchange of Targhee's assets for Big Valley shares. And at the crucial time of final approval of that sale, Meikle has not been shown to have had any undue influence over the Targhee board.

Therefore, his ability to benefit in the combined sales of Sioux and Targhee to Big Valley, while certainly, relevant, triggered no duty of disclosure to Targhee.

 Nor did Sioux have such a duty. Its relationship to Targhee was as a "sister" corporation, with overlapping owners. There is no evidence of an overlap of directors or officers, however; nor is there anything in this record to support Kunz's summary allegation that Sioux controlled its shareholders who sat on the Targhee board. Lacking any evidence to support the charge of improper influence, the assertion that Sioux had a duty to disclose facts to Targhee's members must be rejected.

 Similarly, the evidence against Hillman is insufficient to establish a duty of disclosure. At the time the sale was finally approved, he had resigned from the Targhee board and thus had no relationship with Targhee members other than that of a fellow member. Without action by the board subsequent to his resignation, the sale would have been canceled since the closing deadlines were not met. Like Meikle, Hillman had the potential to benefit from an advantageous sale of Sioux along with Targhee, but on a key question in the duty analysis, his relationship to Targhee, Hillman had managed to extricate himself from Rule 10b–5 liability by the time final approval of the sale took place.

The other defendants, all of whom did maintain a fiduciary relationship with Targhee when the sale was finally approved, are Jolley, Hansen, Boyle, Mitchell, Revello, Smoot, Powell, Sewell, and Commander. All nine of these remaining defendants owed fiduciary duties to Targhee's members—Jolley as counsel,[12] and the other eight as directors. Thus, on the first factor of the Rule 10b–5 duty analysis, relationship to the plaintiff, they stand in similar positions, as likely candidates for a duty of disclosure. As to access to information, the eight directors were also roughly equivalent; Jolley, who virtually controlled access to Targhee's files and records, had truly superior access. And on the record before us, all nine were apparently made equally aware of the corporation's reliance on their good-faith business judgment.

On the remaining two factors in the duty analysis, there are sharper differences among these defendants. The benefits to be derived from their relationship to Targhee were much greater for those who owned Sioux shares at the time of the sale (Hansen, Boyle, Mitchell, and Revello) than for those who did not (Jolley, Smoot, Powell, Sewell, and Commander). Smoot and Powell benefited from the sale in the sense that their guaranties of Targhee debts would be less risky after the Big Valley takeover. But even assuming that Kunz could prove that this affected their objectivity to some extent (which he has not shown he can), we do not believe that the shoring up of their gratuitous prior guaranties was enough to distinguish Smoot and Powell from the directors who had not been as generous when Valley Bank demanded cosigners for Targhee's credit. In short, on the record before us, Jolley, Smoot, Powell, Sewell, and Commander received equally little benefit from their roles as counsel and directors. The shareholders of Sioux, which enjoyed an advantageous contract relationship with Targhee and stood to profit from the Robinson takeover, received a greater benefit and thus are more likely candidates for a duty of disclosure on this factor in the duty analysis.

On the final factor, activity in initiating the securities transaction, Hansen was the most likely candidate for a duty of disclosure. Hansen assumed the duties of principal liaison between Targhee and the Robinson group, and went on record as "pushing" the transaction questioned here. He told the board at a crucial point that unless the sale was approved, Robinson's offer would be lost. Then, along with seven other directors whose roles were less crucial, he voted for the sale. Although Jolley, as

---

**12.** *See* ABA Code of Professional Responsibility, Disciplinary Rule 5–105, and Ethical Consideration 5–18.

Targhee's attorney, drafted and reviewed the sale documents and attended most of the sessions with the Robinson group, he had no vote on the board and did not join in Hansen's urgings.

■ Weighing all these facts in light of the principles of full disclosure that Rule 10b–5 was meant to foster, we hold that, of the nine remaining defendants, those who owned Sioux shares (Hansen, Boyle, Mitchell, and Revello) owed a duty to disclose the directors' Sioux ownership, and any other facts that may turn out to have been material, to all the Targhee members. Those who did not own Sioux (Jolley, Smoot, Powell, Sewell, and Commander) owed no such duty under Rule 10b–5.

In sum, the trial court properly granted summary judgment on Count 1 to all defendants except Hansen, Boyle, Mitchell, and Revello. As to those defendants, further proceedings on the issues of materiality, scienter, causation, and damages are needed before the Rule 10b–5 issues are finally determined.

### E. Other Federal Securities Law Claims.

■ Count 7, a derivative count for an injunction against the eight directors who voted for the Big Valley sale, was predicated on alleged violations of provisions of the Securities Exchange Act of 1934 other than Section 10(b). These provisions include the act's registration requirements and proxy rules. The trial court, in its order of September 20, 1976, dismissed this count in a footnote, holding that since the balance-sheet asset value of Targhee was less than $1 million, these provisions were inapplicable to the corporation under 15 U.S.C. § 78*l* (g). On appeal, Kunz has presented no authority or facts to dispute the trial court's interpretation of the Act on these claims, and the dismissal of this count must therefore be affirmed.

### F. Pendent Jurisdiction.

The only surviving federal-question claim is in Count 1: the derivative claim of Kunz against Hansen, Boyle, Mitchell, and Revello. Therefore Counts 2 through 6 must be dismissed as against all other parties since jurisdiction over them was pendent. *See Ayala v. United States,* 550 F.2d 1196 (9th Cir. 1977), *cert. dismissed,* 435 U.S. 982, 98 S.Ct. 50, 54 L.Ed.2d 70 (1978); *Moor v. Madigan,* 458 F.2d 1217, 1220–22 (9th Cir. 1972), *rev'd on other grounds sub nom. Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). As to the pendent claims that survive, we express no opinion whether summary judgment on the merits is proper at this stage of the proceedings.

### G. Diversity Jurisdiction.

With Penfold, Cooper, Moulton, and Butler dismissed as plaintiffs and Targhee aligned with the defendants for purposes of determining diversity in Kunz's derivative action (*see Smith v. Sperling,* 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); *Swanson v. Traer,* 354 U.S. 114, 77 S.Ct. 1116, 1 L.Ed.2d 1221 (1957)), diversity appears to exist in Counts 8 through 13. If diversity does exist, the trial court has jurisdiction to hear them on their merits. We express no opinion as to whether they are now ripe for summary judgment on the merits.

### H. Counts 14 through 16.

Counts 14 through 16 were dismissed on July 18, 1975, and, in the face of a motion to dismiss Count 17, Kunz was permitted to amend that count. On August 5, 1975, Kunz lodged a second amended complaint that included new Counts 14 through 17. In its order of September 20, 1976, the trial court allowed the plaintiffs to amend Count 17, but it is unclear what its ruling was on the proposed amendment of Counts 14 through 16. The amendment of those counts would delete the government defendants and leave only Meikle and Valley Bank as defendants; in addition, the statement of jurisdiction on Counts 14 through 16 would be amended to include pendent and diversity jurisdiction. We note that under the amended complaint, in light of our holding today, diversity would appear to exist. We remand to the district court for a more specific disposition of Counts 14

through 16, either as amended or in their original form. We express no opinion whether summary judgment on the merits might now be proper on those counts.

## V. DISPOSITION

As to all counts brought by plaintiffs Penfold, Cooper, Moulton, and Butler, the judgment of dismissal is affirmed.

As to all federal-question and pendent counts against Jolley, Smoot, Powell, Sewell, Commander, Meikle, Valley Bank, Robinson, Big Valley, Meranus, and Anness, the judgment of dismissal is affirmed.

As to Counts 7 and 17, the judgment of dismissal is affirmed.

Counts 14 to 16, insofar as they are based on jurisdiction other than pendent jurisdiction, are remanded for further proceedings consistent with this opinion. Insofar as they are based on pendent jurisdiction, the judgment of dismissal on these counts is affirmed.

As to all other counts, the judgment of dismissal is reversed, and the case is remanded.